

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed November 17, 2025**

_____
**United States Bankruptcy Judge**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 19-45049-ELM |
| CEDRIC LAVON BILLUPS, SR. and | § | |
| DONNA MARIE BILLUPS, | § | Chapter 13 |
| | § | |
|     Debtors. | § | |
| | § | |
| CEDRIC LAVON BILLUPS, SR. and | § | |
| DONNA MARIE BILLUPS, | § | |
| | § | |
|     Plaintiffs, | § | |
| v. | § | Adversary No. 20-04011 |
| | § | |
| PARTNERS FOR PAYMENT | § | |
| RELIEF DE II, LLC and | § | |
| ARBELAEZ INVESTMENTS, LLC, | § | |
| | § | |
|     Defendants. | § | |

## **PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Pursuant to 28 U.S.C. § 157(c)(1), the above-signed bankruptcy judge of the United States

Bankruptcy Court for the Northern District of Texas (the "**Bankruptcy Court**") respectfully

submits to The Honorable United States District Court for the Northern District of Texas, Fort

Worth Division (the "**District Court**"), the following post-trial proposed findings of fact and

conclusions of law and recommendation with respect to the above-captioned adversary proceeding (the "**Adversary Proceeding**").

*PROCEDRUAL BACKGROUND*

1.      On December 11, 2019 (the "**Petition Date**"), Cedric Lavon Billups, Sr. ("**Mr. Billups**") and Donna Marie Billups ("**Mrs. Billups**") (Mr. Billups and Mrs. Billups collectively referred to as the "**Plaintiffs**") filed a joint voluntary petition with the Bankruptcy Court for relief under chapter 13 of the Bankruptcy Code, thereby initiating Case No. 19-45049 (the "**Bankruptcy Case**").

2.      On February 11, 2020, the Plaintiffs initiated the Adversary Proceeding with the filing of their original complaint against a variety of defendants, including Partners for Payment Relief DE II, LLC ("**PPR**") and Arbelaez Investments, LLC ("**Arbelaez Investments**").[1]  On September 7, 2020, the Plaintiffs filed their live *Plaintiffs' Second Amended Complaint* (the "**Amended Complaint**").[2]  While the Amended Complaint was likewise asserted against a variety of defendants, all of the defendants other than PPR and Arbelaez Investments (together, the "**Defendants**") have since been dismissed from the Adversary Proceeding.[3]

3.      Pursuant to the Amended Complaint, the Plaintiffs have asserted the following causes of action against the Defendants:[4]

---

[1] Adv. Docket No. 1.

[2] Adv. Docket No. 71 (Amended Complaint).

[3] *See* Adv. Docket No. 100 (order granting Debtors' motion to dismiss claims against PHH Mortgage Corporation), Adv. Docket No. 246 (Plaintiffs' notice of dismissal of claims against Ocwen Loan Servicing, LLC), and Adv. Docket No. 255 (order approving joint stipulation for the dismissal of Residential Funding Co., LLC and Stelis, LLC).

[4] The Plaintiffs have designated their causes of action as "First Cause of Action," "Second Cause of Action," etc.  For brevity, however, they are referred to herein by count and number (*e.g.*, "First Cause of Action" is simply referred to as "Count 1").

Count 1:     Petition to Remove Cloud on Title and To Quiet Title[5]
             [Request Under Texas Uniform Declaratory Judgment Act]
             (Against both Defendants)

Count 2:     Wrongful Foreclosure – Forged or Fraudulent Conveyance[6]
             (Against both Defendants)

Count 3:     Wrongful Foreclosure – No Authority to Act[7]
             (Against PPR)

Count 6:     Intentional Infliction of Emotional Distress[8]
             (Against PPR)

The Plaintiffs have separately framed Counts 4 and 5 as independent causes of action for damages (Count 4: "Monetary Damages"; Count 5: "Exemplary Damages").[9]   Because the damages requests do not constitute independent causes of action, however, they are not separately delineated above.  The Plaintiffs have also separately requested an award of attorney's fees.[10]

4.      On September 22, 2020, PPR filed its answer to the Amended Complaint (the "**PPR Answer**").[11]   Pursuant to the PPR Answer, PPR asserts the following, among other, affirmative defenses: (a) failure to state a claim upon which relief may be granted; (b) lack of standing (with respect to challenges to the validity of note and lien assignments); and (c) lack of proximate cause of damages.[12]   PPR also requests an award of attorney's fees in its prayer for relief.[13]

---

[5] *See* Amended Complaint § F.

[6] *See* Amended Complaint § G.

[7] *See* Amended Complaint § H.

[8] *See* Amended Complaint § K.

[9] *See* Amended Complaint §§ I-J.

[10] *See* Amended Complaint § L.

[11] Adv. Docket No. 87 (PPR Answer).

[12] *See* PPR Answer, at pp.19-21.

[13] *See* PPR Answer, at p.21.

5.      On December 7, 2020, Arbelaez Investments filed its answer to the Amended Complaint (the "**Arbelaez Answer**").[14]  Pursuant to the Arbelaez Answer, Arbelaez Investments asserts the affirmative defense of being a good faith purchaser for value in relation to Counts 2 and 3 of the Amended Complaint.[15]

6.      On June 30, 2022, the Plaintiffs and Defendants filed the *Parties' Proposed Joint Pre-Trial Order* (the "**Pretrial Order**").[16]  In Part IV of the Pretrial Order, the parties included their joint "Statement of Stipulated Facts" (the "**Joint Stipulations**").[17]  By order entered in the Adversary Proceeding on July 6, 2022, the Pretrial Order was approved and adopted by the Bankruptcy Court.[18]

7.      The Bankruptcy Court conducted a three-day trial on September 19, 20 and 22, 2022, at the conclusion of which the matter was taken under advisement.[19]

### *JURISDICTION*

8.      The outcome of the causes of action asserted by the Plaintiffs against the Defendants in this Adversary Proceeding will have an impact upon the administration of the Plaintiffs' bankruptcy estate in the Bankruptcy Case.  Consequently, the District Court has jurisdiction of the Adversary Proceeding pursuant to 28 U.S.C. § 1334(b), inasmuch as each of the causes of action asserted in the Adversary Proceeding seeks relief that is at least "related to" the

---

[14] Adv. Docket No. 120 (Arbelaez Answer).

[15] *See* Arbelaez Answer ¶ 87.

[16] Adv. Docket No. 295 (Pretrial Order).

[17] *See* Pretrial Order, at pp.5-8 (Joint Stipulations).  The parties have not separately numbered the Joint Stipulations in the Pretrial Order.  For ease of reference, however, paragraph numbers are used herein to refer to the particular paragraph at issue within the Joint Stipulations.

[18] See Adv. Docket No. 302.

[19] *See* Adv. Docket Nos. 313-315.

Bankruptcy Case.[20]  Pursuant to 28 U.S.C. § 157(a) and *Miscellaneous Order No. 33: Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* (N.D. Tex. Aug. 3, 1984), the Adversary Proceeding was automatically referred by the District Court to the Bankruptcy Court upon its commencement.[21]

9.      Based upon the nature of the causes of action asserted pursuant to the Amended Complaint, the Adversary Proceeding is not a core proceeding pursuant to 28 U.S.C. § 157(b).[22] Therefore, because the Defendants have not consented to the Bankruptcy Court's entry of a final judgment on any of the causes of action asserted,[23] the Bankruptcy Court must submit proposed findings of fact and conclusions of law to the District Court, with the District Court to thereafter consider entry of a final judgment upon consideration of such proposed findings and conclusions and a *de novo* review of any matters to which a party timely objects.[24]

### PROPOSED FINDINGS AND CONCLUSIONS

### Proposed Findings of Fact[25]

10.      All prior paragraphs are incorporated herein by reference.

---

[20] *See* 11 U.S.C. § 1334(b) (subject to certain exceptions inapplicable to this Adversary Proceeding, "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11"); *see also U.S. Brass Corp. v. Travelers Ins. Group, Inc. (In re U.S. Brass Corp.)*, 301 F.3d 296, 304 (5th Cir. 2002) ("A proceeding is 'related to' a bankruptcy if 'the outcome of that proceeding could *conceivably* have any effect on the estate being administered in bankruptcy.'") (quoting *Wood v. Wood (In re Wood)*, 825 F.2d 90, 92 (5th Cir. 1987) (quoting *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3rd Cir. 1984))).

[21] *See* 28 U.S.C. § 157(a) ("Each district court may provide that … any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district").

[22] *See* 28 U.S.C. § 157(b)(1) and (b)(2); *see also Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982).

[23] *See* 28 U.S.C. § 157(c)(2) (provision for parties' consent to entry of final judgment on non-core claims); *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665 (2015) (discussing parties' ability to consent to the bankruptcy court's entry of final judgment).

[24] *See* 28 U.S.C. § 157(c)(1); *see also Executive Benefits Ins. Agency v. Arkison*, 573 U.S. 25 (2014).

[25] To the extent any of the following proposed findings of fact are more appropriately categorized as proposed conclusions of law or include any proposed conclusions of law, they should be deemed as such.

*A.*     ***The Plaintiffs Purchase Their Home with Financing Provided by Sebring***

11.     In 2000, the Plaintiffs desired to purchase a house located at 2723 Excalibur Drive, Grand Prairie, Texas 75052 (the "**Property**").  The Property's legal description is:

> Lot 27, Block E, of PHASE I, KINGSWOOD FOREST ADDITION, an Addition to the City of Arlington, Tarrant County, Texas, according to the Map thereof recorded in Cabinet A, Slide 4340, of the Plat records of Tarrant County, Texas.[26]

12.     The purchase price of the Property was $155,500.00.[27]  To finance the purchase, the Plaintiffs requested a $147,250 loan from Sebring Capital Corporation ("**Sebring**").[28]  Sebring agreed to provide the financing, but on terms that would result in two different loans: *first*, a $132,150 30-year adjustable rate mortgage loan to be secured by a first priority lien (the "**$132K Loan**"); and, *second*, a $23,300 15-year fixed rate mortgage loan to be secured by a junior lien (the "**$23K Loan**") (the $132K Loan and $23K Loan collectively referred to as the "**Billups Loans**").[29]

13.     On or about December 22, 2000, the Plaintiffs purchased the Property, obtaining title to the Property pursuant to a Special Warranty Deed with Vendor's Lien, dated December 22, 2000 (the "**Special Warranty Deed**").[30]  In connection therewith, the Plaintiffs: (a) executed an Adjustable Rate Note made payable to the order of Sebring in the original principal amount of $132,150 (the "**$132K Note**")[31] secured by a first priority lien in the Property (the "**$132K Note Lien**") pursuant to the terms of an executed Deed of Trust recorded at Instrument No. D201003425

---

[26] *See* Joint Stipulations ¶ 1.

[27] *See* Plaintiffs Exh. 15, at p.19.

[28] *See id*.

[29] *See id*.

[30] *See* Plaintiffs Exh. 1 (Special Warranty Deed) (evidencing Engle Homes/Texas, Inc.'s conveyance of the Property to the Plaintiffs).

[31] *See* Plaintiffs Exh. 30, at pp.7-10 ($132K Note); *see also* Joint Stipulations ¶ 2.

of the Official Public Records of Tarrant County, Texas (the "**$132K Note D/T**");[32] and (b) executed a Note made payable to the order of Sebring in the original principal amount of $23,300, bearing interest at the rate of $14.990% per annum (the "**$23K Note**"),[33] secured by a junior lien in the Property (the "**$23K Note Lien**") pursuant to the terms of an executed Purchase Money Deed of Trust recorded at Instrument No. D201003427 in the Official Public Records of Tarrant County, Texas on January 4, 2001 (the "**$23K Note D/T**").[34]

14.    Under the terms of the $23K Note, the Plaintiffs acknowledged that the Note could be transferred.[35]  Similarly, under the terms of the $23K Note D/T, the Plaintiffs acknowledged that the $23K Note D/T and the $23K Note Lien granted thereby could be transferred.[36]

## B.    The Billups Loans are Transferred as Part of a Market Securitization

15.    As was common in the year-2000 time frame, Sebring planned to immediately sell off the two loans through the secondary securitization market.  Residential Funding Corporation ("**RFC**") assisted Sebring, or was otherwise involved, in such process.  Accordingly, on December 27, 2000: (a) Sebring transferred the $132K Note to RFC by endorsing it as payable to the order of RFC;[37] and (b) Sebring transferred the $23K Note to RFC by endorsing it as payable to the order of RFC ("**Sebring Endorsement**").[38]

16.    Separately, Residential Securities Corporation ("**RASC**") had been readying things for a public offering of securities to be backed by pooled residential mortgage loans which would

---

[32] See Plaintiffs Exh. 3 ($132K Note D/T); see also Joint Stipulations ¶ 2.

[33] See Plaintiffs Exh. 1-1 ($23K Note); D/PPR Exh. 44 (originally executed copy of $23K Note); see also Joint Stipulations ¶ 3.

[34] See Plaintiffs Exh. 4 ($23K Note D/T); see also Joint Stipulations ¶ 3.

[35] See $23K Note ¶ 1.

[36] See $23K Note D/T ¶ 11.

[37] See $132K Note, at p.3 (endorsement from Sebring to the order of RFC).

[38] See $23K Note, at p.2 (endorsement from Sebring to the order of RFC).

include the Billups Loans.   Under the contemplated securitization, a trust would be established into which the pooled mortgage loans would be transferred and Bank One, National Association ("**Bank One**") would serve as the trustee of the trust.   Thus, on December 27, 2000, after RFC had been assigned the $132K Note and $23K Note: (a) RFC transferred the $132K Note to Bank One by endorsing it as payable to the order of Bank One;[39] (b) RFC transferred the $23K Note to Bank One by endorsing it as payable to the order of Bank One ("**First RFC Endorsement**");[40] (c) Sebring assigned the $132K Note Lien to Bank One by executing a notarized Assignment of Deed of Trust or Mortgage, dated December 27, 2000;[41] and (d) Sebring assigned the $23K Note Lien to Bank One (the "**Sebring D/T Lien Assignment**") by executing a notarized Assignment of Deed of Trust or Mortgage, dated December 27, 2000 (the "**Sebring D/T Lien Assignment Instrument**").[42]

17.    Following the assignments, Homecomings Financial, LLC ("**Homecomings**") was engaged to service the pooled loans, including each of the Billups Loans.[43]

18.    Thereafter, on March 12, 2001, RASC filed a Form 8-K Report with the Securities and Exchange Commission ("**SEC**") to report that, on or about March 29, 2001, it expected to cause the issuance and sale of Home Equity Pass-Through Certificates, Series 2001-KS1 (the "**RASC 2001-KS1 Certs**") pursuant to a Pooling and Servicing Agreement to be dated as of March 1, 2001, among RASC, RFC (as master servicer), and Bank One (as the trustee).[44]   In follow-up,

---

[39] *See* $132K Note, at p.3 (endorsement from RFC to the order of Bank One).

[40] *See* $23K Note, at p.2 (endorsement from RFC to the order of Bank One).

[41] *See* Plaintiffs Exh. 30, at p.32; *see also* Joint Stipulations ¶ 4.

[42] *See* Plaintiffs Exh. 5 (Sebring D/T Lien Assignment Instrument); D/PPR (originally executed copy of Sebring D/T Lien Assignment Instrument); *see also* Joint Stipulations ¶ 4.

[43] *See* Joint Stipulations ¶ 4.

[44] *See* Plaintiffs Exh. 19 (copy of RASC 3/12/2001 Form 8-K).

on March 23, 2001, RASC filed a prospectus supplement with the SEC in regards to the offering

of the $1,500,000,000 in RASC 2001-KS1 Certs.[45]

19.    Eventually, the offering closed.  On March 15, 2002, the Sebring D/T Lien

Assignment Instrument was recorded at Instrument No. D202073028 in the Official Public

Records of Tarrant County, Texas.[46]

## C.    The Plaintiffs Fall Behind on Their Loan Payments; The First Bankruptcy Case is Filed

20.    Several years later, beginning around late 2003 or early 2004, Mr. Billups began to

experience severe medical problems that eventually led to the Plaintiffs having financial difficulty

and an inability to keep up with payments on the Billups Loans.  This led to the filing of the

Plaintiffs' first chapter 13 bankruptcy case with the Bankruptcy Court in 2004 under Case No. 04-

46367 (the "**First Bankruptcy Case**").[47]

21.    Given the existence of the two different Billups Loans, Homecomings filed two

separate proofs of claim on behalf of Bank One in the First Bankruptcy Case: (a) a Secured Proof

of Claim, assigned Claim No. 3, in relation to the $132K Loan;[48] and (b) a Secured Proof of Claim,

assigned Claim No. 4, in relation to the $23K Loan.[49]

22.    Similarly, in the Plaintiffs' proposed chapter 13 plan filed in the First Bankruptcy

Case on April 29, 2005, the Plaintiffs separately referenced the two Billups Loans, proposing to

cure the outstanding arrearage under each of the loans through plan payments to be made by the

chapter 13 trustee during the first 48 months of the plan, and to otherwise resume making regular

---

[45] *See* Plaintiffs Exh. 20 (copy of RASC 3/23/2001 prospectus supplement).

[46] *See* Plaintiffs Exh. 5, at p.3; *see also* Joint Stipulations ¶ 4.

[47] *See generally* docket of the First Bankruptcy Case (the "**First Bankruptcy Case Docket**"), of which judicial notice is taken.

[48] *See* Plaintiffs Exh. 27 (copy of Claim No. 3).

[49] *See* Plaintiffs Exh. 28 (copy of Claim No. 4).

monthly mortgage payments on the loans directly to Homecomings, as the servicer of the loans.[50]
On July 11, 2005, the Bankruptcy Court entered an order confirming the Plaintiffs' proposed
chapter 13 plan.[51]

23.    Because of alleged post-petition defaults under the $132K Loan, on July 11, 2005,
Homecomings filed a motion for relief from the automatic stay of 11 U.S.C. § 362(a) to enable it
to pursue foreclosure of the Property under the terms of the $132K Note D/T.[52]  No reference was
made to the $23K Loan within the motion.  In resolution of the motion, on August 11, 2005, the
Bankruptcy Court entered the parties' agreed proposed order pursuant to which the stay would
remain in force, but conditioned upon the Plaintiffs' timely making of future monthly mortgage
payments on the $132K Loan and modification of the chapter 13 plan to address the post-petition
arrearage (the "**Agreed Lift Stay Order**").[53]  Pursuant to the Agreed Lift Stay Order, in the event
of an uncured default thereafter, the automatic stay would automatically terminate to enable
Homecomings to pursue foreclosure against the Property.  The Agreed Lift Stay Order neither
referenced nor dealt with the $23K Loan.

### D.    *Subsequent Loan Transfers and the Plaintiffs' Default on the $23K Loan*

24.    On or about November 1, 2005, in connection with consummating the merger of
Bank One Corporation into JPMorgan Chase & Co. (the "**Bank One Merger**"),[54] the Comptroller
of the Currency approved the merger of Bank One Trust Company, N.A. into and under the charter
and title of JPMorgan Chase Bank, N.A.[55]    As a result, JPMorgan Chase Bank, N.A.

---

[50] *See* First Bankruptcy Case Docket No. 9 (proposed chapter 13 plan), § D (provisions related to the Billups Loans).

[51] *See* First Bankruptcy Case Docket No. 15.

[52] *See* First Bankruptcy Case Docket No. 16.

[53] *See* First Bankruptcy Case Docket No. 20.

[54] *See* Joint Stipulations ¶ 8; *see also* JPMorgan Chase & Co. Form 8-K (July 1, 2004),
https://www.sec.gov/Archives/edgar/data/19617/000119312504112906/d8k.htm.

[55] *See* D/PPR Exh. 20 (copy of merger approval letter).

("**JPMorgan**") became the successor in interest to Bank One in relation to each of the Billups Loans. Following the merger, Homecomings remained in place as the servicer of each of the Billups Loans.

25.     A few months later, in February 2006, the Plaintiffs defaulted under the $23K Loan.[56] As a result, on or about March 2, 2006, GMAC Residential Funding Corp. d/b/a GMAC RFC ("**GMAC RFC**"), an affiliate of Homecomings, undertook an evaluation of recourse options. Specifically, after identifying the then-unpaid principal balance of the $23K Loan to be approximately $20,129, the then-unpaid principal balance of the $132K Loan (secured by the senior, first priority lien in the Property) to be approximately $139,512, and the then-estimated market value of the Property to be approximately $175,000, and after having compared the potential loss scenarios in the event of a Property foreclosure/resale versus a loan charge-off, GMAC RFC determined to recommend that the balance of the $23K Loan be charged off.[57] It appears that the recommendation was adopted. The charge off of the loan, however, did not eliminate the debt or the liability of the Plaintiffs. From a practical standpoint, it just simply meant that Homecomings stopped sending regular monthly statements.

26.     Later, on or about April 7, 2006, another major transaction took place. Pursuant to a Purchase and Assumption Agreement By and Between The Bank of New York Company, Inc. and JPMorgan Chase & Co., dated April 7, 2006, The Bank of New York Company, Inc. acquired JPMorgan Chose & Co.'s corporate trust business in exchange for The Bank of New York Company, Inc.'s retail banking business (the "**JPMorgan-BONY Transaction**").[58] As a result of

---

[56] *See* Plaintiffs Exh. 15, at p.45 (GMAC RFC loan evaluation worksheet, dated 3/2/2006, noting last payment in 1/2006).

[57] *See id*., at p.46.

[58] *See* D/PPR Exh. 38 (Purchase and Assumption Agreement); *see also* JPMorgan Chase & Co. Form 8-K (October 1, 2006), https://www.sec.gov/Archives/edgar/data/19617/000089882206001088/jpmorgan8k.htm.

consummation of the JPMorgan-BONY Transaction, The Bank of New York Mellon Trust Company, National Association f/k/a The Bank of New York Trust Company, N.A. ("**BONY**") became the successor in interest to JPMorgan in relation to the Billups Loans.

### E.    The Plaintiffs' Default on the $132K Loan

27.     On October 10, 2008, after the Plaintiffs had defaulted on the $132K Loan, Homecomings filed a Notice of Termination of Automatic Stay in the First Bankruptcy Case pursuant to the Agreed Lift Stay Order.[59]  Thereafter, at the direction of Homecomings, efforts commenced to accelerate the $132K Loan and begin the process of taking steps to foreclose on the Property.

28.     In response, the Plaintiffs submitted a loan modification request to Homecomings to address the default and prevent the foreclosure.  On April 23, 2009, Homecomings notified the Plaintiffs that the loan modification request had been approved (the "**Loan Mod Approval Letter**").[60]  As explained by Homecomings in the Loan Mod Approval Letter, the modified loan would address the following amounts, totaling $25,749.14, in relation to the $132K Loan: unpaid interest from October 2008 through May 2009, totaling $8,034.46; unpaid escrow shortages of $15,823.27; foreclosure attorney's fees and costs of $1,056.92; late charges of $567.45; inspection fees of $134.04; corporate advances of $83.00; and default fees paid of $50.00.  With respect to the $25,749.14 total, $16,930.19 of it would be added to the principal balance of the $132K Loan (bringing the new unpaid principal balance of the $132K Loan to $142,478.36); $7,206.99 of it would be forgiven; and then, after taking into account the suspense balance on hand of $311.96,

---

[59] *See* First Bankruptcy Case Docket No. 49.

[60] *See* Plaintiffs Exh. 13.

the remaining $1,300 would have to be paid by the Plaintiffs as a down payment by April 30, 2009.[61]

29.     Importantly, nowhere within the Loan Mod Approval Letter was there any mention of the $23K Loan.  According to Mrs. Billups, however, she was informed by her attorney that the $23K Loan was being charged off.

30.     On or about April 23, 2009, the Plaintiffs executed the Fixed Rate Loan Modification Agreement, dated April 23, 2009, between the Plaintiffs and Homecomings (the "**Loan Mod Agreement**").[62]  The Loan Mod Agreement specifically references the $132K Note. No mention at all is made of the $23K Note.  The Loan Mod Agreement also specifically references the new principal balance of $142,478.36 referenced in the Loan Mod Approval Letter – *i.e.*, the original outstanding principal balance of the $132K Loan plus the $16,930.19 in capitalized interest, fees, and expenses from the worksheet.  There is no reference to any amounts associated with the $23K Loan.  Additionally, the Loan Mod Agreement includes a merger clause by which the Plaintiffs expressly agreed to the following:

> EACH OF THE BORROWER [PLAINTIFFS] AND THE LENDER ACKNOWELDGE THAT NO REPRESENTATIONS, AGREEMENTS OR PROMISES WERE MADE BY THE OTHER PARTY OR ANY OF ITS REPRESENTATIVES OTHER THAN THOSE REPRESENTATIONS, AGREEMENTS RO PROMISES SPECIFICALLY CONTAINED HEREIN. THIS AGREEMENT, AND THE NOTE AND SECURITY INSTRUMENT (AS AMENDED) SETS FORTH THE ENTIRE UNDERSTANDING BETWEEN THE PARTIES.  THERE ARE NO UNWRITTEN AGREEMENTS BETWEEN THE PARTIES.[63]

---

[61] *See id.*

[62] *See* Plaintiffs Exh. 14.

[63] *See* Loan Mod Agreement § 8.

### F.   Sale of the "Zombie" $23K Loan

31.     Between 2007 and 2010, a period of considerable turmoil existed in the financial markets due to the earlier undisciplined expansion of mortgage availability to high-risk borrowers. Ultimately, as the housing market began to tumble, a mortgage market crisis erupted with mass mortgage sell-offs.[64]  In the midst of such turmoil, a variety of investor-backed entities were organized to pursue the purchase of charged-off or non-performing mortgage loans and a variety of investor-backed entities were organized to provide financing to such purchasers.  On the purchasing side, purchasers typically looked for opportunities to buy the charged-off/non-performing mortgages at a deep discount with the objective of eventually reselling them to others at a profit or, alternatively, enforcing them once the housing market had stabilized.

32.     Among the entities that were organized in and around this time frame and got involved in the distressed debt market were Dreambuilder Investments, LLC ("**DBI**") (and its affiliate DBI Coinvestor Fund VIII, LLC ("**DBI VIII**")), Ophrys, LLC ("**Ophrys**"), Cerastes, LLC ("**Cerastes**"), Oak Harbor Capital X, LLC ("**Oak Harbor**"), Stelis, LLC ("**Stelis**"), DL Solomon, Inc. ("**DL Solomon**"), and PPR.

33.     While the Plaintiffs did not fall into the category of unqualified, high-risk borrowers, their $23K Loan, once charged off, got caught up in this wave of opportunistic selling and purchasing.

### 1.   Stelis' Purchase of the $23K Loan

34.     DBI was organized in 2005 as a purchaser-side entity.  At all relevant times, it was owned, controlled, and managed by Robert Palmer ("**Palmer**") and Peter Andrews ("**Andrews**"),

---

[64] *See generally* John V. Duca, *Subprime Mortgage Crisis*, Federal Reserve History (2013), https://www.federalreservehistory.org/essays/subprime-mortgage-crisis.

with Palmer serving as its CEO and Andrews serving as its President.[65]  In 2011, Palmer and Andrews organized DBI VIII as an affiliate of DBI for certain specified DBI business opportunities.[66]  Both Palmer and Andrews were members of DBI VIII, and DBI VIII was managed and operated by DBI, Palmer, and Andrews.[67]

35.    Ophrys was organized in 2007 to provide financing for purchaser-side transactions.[68]  At all relevant times, William Weinstein ("**Weinstein**") was either the sole or 99% member of Ophrys and he served as Ophrys' CEO.[69]

36.    In 2013, Weinstein, Palmer, and Andrews met in connection with DBI VIII's obtaining of financing through Weinstein for its acquisition of two mortgage loan portfolios.[70]  In follow-up to the transaction, Weinstein, Palmer, and Andrews agreed to combine forces on additional opportunities.[71]  To facilitate the same: (a) Weinstein organized Cerastes as a subsidiary of Ophrys to be involved in the project (with Cerastes to, at all relevant times, be controlled by Weinstein);[72] (b) Weinstein organized Oak Harbor on July 8, 2013, to serve as a financing party for the project (with Oak Harbor to, at all relevant times, be controlled by Weinstein as its CEO);[73] and (c) Weinstein and Ophrys caused Stelis to be organized on July 13, 2013 (with Stelis to be owned 95% by Cerastes and 5% by DBI VIII).[74]

---

[65] *See* Plaintiffs Exh. 17-10 ¶¶ 2-5.

[66] *See id.* ¶ 7.

[67] *See id.* ¶¶ 1 and 8-9; Plaintiffs Exh. 16-4 ¶ 5.

[68] *See* Plaintiffs Exh. 17-10 ¶ 21.

[69] *See id.* ¶¶ 22 and 58; Plaintiffs Exh. 16-4 ¶ 4.

[70] *See* Plaintiffs Exh. 17-10 ¶ 13.

[71] *See id.* ¶ 15.

[72] *See* Plaintiffs Exh. 17-10 ¶¶ 32-34.

[73] *See id.* ¶ 35; Plaintiffs Exh. 16, at p.9.

[74] *See* Plaintiffs Exh. 17-10 ¶ 16; Plaintiffs Exh. 16-5 ¶ 2; Plaintiffs Exh. 16-4 ¶ 3.

37.     With respect to Stelis' operations, Cerastas and DBI VIII entered into a Limited
Liability Company Agreement of Stelis, LLC, effective July 19, 2013, as amended by a First
Amendment, also effective July 19, 2013 (as amended, the "**Stelis LLC Agreement**").[75]   Under
the terms of the Stelis LLC Agreement, Ophrys was appointed to serve as the non-member
Manager of Stelis and DBI VIII was appointed as Stelis' Mortgage Servicer.[76]   Additionally, on
or about July 19, 2013, Palmer was appointed as an authorized representative of Stelis for the
purpose of executing purchase and sale agreements, assignments, and related documentation for
approved Stelis transactions (referred to herein as the "**Palmer Authorization**").[77]

38.     Between July 19, 2013, and June 20, 2014, Stelis acquired seven different portfolios
of mortgage loans sourced by DBI, five of which were comprised of second mortgage debt.[78]   The
$23K Loan was within an RFC loan portfolio acquired by Stelis.

39.     In relation to Stelis' purchase of the $23K Loan, Stelis obtained the following
executed documents: (a) in relation to BONY's transfer of the $23K Note to RFC, and RFC's
transfer of the $23K Note to Stelis, an Allonge to Note (i) executed by Mary Miller ("**Miller**"), on
behalf of Ocwen as attorney in fact for BONY,[79] to transfer the $23K Note by BONY, as successor
to JPMorgan, as successor in interest to Bank One, as trustee for the RASC 2001-KS1 Certs, to
the order of RFC (the "**BONY Endorsement**"), and (ii) executed by Miller, on behalf of RFC, to
transfer the $23K Note by RFC to the order of Stelis (the "**Second RFC Endorsement**");[80] (b) in

---

[75] *See* Plaintiffs Exh. 16-5 ¶ 8.

[76] *See* Plaintiffs Exh. 17-10 ¶¶ 20 and 28; Plaintiffs Exh. 16-4 ¶ 4; Plaintiffs Exh. 16-5 ¶ 6.

[77] *See* Plaintiffs Exh. 16-4 ¶ 5; Plaintiffs Exh. 16-5 ¶ 13.

[78] *See* Plaintiffs Exh. 17-10 ¶¶ 60-61.

[79] As explained by Benjamin Verdooren ("**Verdooren**"), a Senior Loan Analyst at Ocwen Loan Servicing, LLC
("**Ocwen**"), Ocwen took over the servicing rights in relation to the $23K Loan at some point after consummation of
the JPMorgan-BONY Transaction.

[80] *See* Plaintiffs Exh. 1-2 (BONY Endorsement and Second RFC Endorsement); D/PPR Exh. 44 (originally executed
copy of the BONY Endorsement and Second RFC Endorsement).

relation to BONY's assignment of the $23K Note Lien to RFC (the "**BONY D/T Lien Assignment**"), a notarized Corporate Assignment of Deed of Trust, dated October 8, 2013, executed by Miller on October 8, 2013, on behalf of Ocwen as attorney in fact for BONY, as successor to JPMorgan, as successor in interest to Bank One, as trustee for the RASC 2001-KS1 Certs (the "**BONY D/T Lien Assignment Instrument**");[81] and (c) in relation to RFC's assignment of the $23K Note Lien to Stelis (the "**RFC D/T Lien Assignment**"), a notarized Corporate Assignment of Deed of Trust, dated October 8, 2013, executed by Miller on October 8, 2013, on behalf of RFC (the "**RFC D/T Lien Assignment Instrument**").[82]

40.     Of note, while both the BONY D/T Lien Assignment Instrument and the RFC D/T Lien Assignment Instrument (collectively, the "**Original BONY & RFC Assignment Instruments**") correctly identified the Plaintiffs, the address of the Property, the date of the original $23K Note D/T, the lienholder under the original $23K Note D/T (*i.e.*, Sebring), and the Instrument No. assigned to the recorded copy of the original $23K Note D/T, they both incorrectly stated that the original $23K Note D/T had been recorded in Dallas County, Texas instead of Tarrant County, Texas.  Compounding on this error was that, for the Property's legal description, the Original BONY & RFC Assignment Instruments state "As Referenced on Original Recorded Document" (which had earlier been referenced as having been filed in Dallas County, Texas).

### 2.     *DBI VIII (as Mortgage Servicer) Pursues the Resale of Certain Acquired Loans*

41.     As indicated above, one of the options typically pursued by a purchaser of troubled loan portfolios is a resale of such loans, or a portion thereof, at a price greater than the deeply

---

[81] *See* Plaintiffs Exh. 15, at pp.13-14 (BONY D/T Lien Assignment Instrument); *see also* Joint Stipulations ¶ 9.

[82] *See* Plaintiffs Exh. 15, at pp.15-16 (RFC D/T Lien Assignment Instrument); *see also* Joint Stipulations ¶ 10.

discounted price paid to acquire them.  As Stelis' Mortgage Servicer, DBI VIII was responsible for pursuing such opportunities.[83]

42.    To be in a position to expeditiously act on an opportunity, it was necessary to secure and quality check loan files associated with loans that had been acquired, and to ready transfer documentation for any resale of some or all of the loans.  With this in mind, DBI VIII arranged for Richmond Monroe Group ("**RMG**") to provide assistance to Stelis in securing and quality checking loan files and in executing transfer documentation for resales.[84]  Steve Fullum ("**Fullum**") was one of the RMG employees assigned to the engagement.[85]

43.    To facilitate the execution of transfer documentation, on October 7, 2013, Palmer, in his capacity as an authorized representative of Stelis under the Palmer Authorization and the Manager of DBI VIII (Stelis' Mortgage Servicer), executed a "Corporate Resolution" purporting to appoint Fullum as an Assistant Vice President of Stelis "with full power to execute on behalf of Stelis all documents necessary to assign, release and/or reconvey Mortgages, Deeds of Trust and other security interests and documentation" (referred to herein as the "**Fullum Resolution**").[86]

### 3.    PPR's Purchase of the $23K Loan

44.    In 2012 or 2013, David Solomon ("**Solomon**"), an individual with nearly ten years of prior experience in the buying and selling of residential mortgage loans, organized DL Solomon to serve as a consulting firm for market participants.[87]  According to Solomon, while less than ideal from a legal standpoint but common within the mortgage industry at the time, DL Solomon would often "facilitate" transactions between market participants by serving as a named party to

---

[83] *See* Plaintiffs Exh. 17-10 ¶¶ 83-84 and 97.

[84] *See* Plaintiffs Exh. 17-5, at pp.14-15 and 19.

[85] *See id*., at p.8.

[86] *See* Plaintiffs Exh. 16-1 (Fullum Resolution).

[87] *See* Plaintiffs Exh. 18, at pp.6-7.

purchase and sale agreements even though, technically, it was at best a nominally-named intermediary party.[88]

45.    At some point in the 2013 to 2014 timeframe, Andrews contacted Solomon for assistance in finding a potential buyer for mortgage loans that DBI had sourced to Stelis.[89]  DBI VIII provided relevant loan information to DL Solomon for purposes of the marketing.  One of the market participants contacted by Solomon was PPR.

46.    PPR had been organized in 2007 as both a purchaser-side entity and an entity that would provide financing for purchaser-side transactions.[90]  Robert Paulus ("**Paulus**"), one of PPR's partners, served as PPR's Director of Borrower Management.[91]  PPR expressed interest in the mortgage loan sale.

47.    Thereafter, on or about March 19, 2014, PPR and DL Solomon entered into a Loan Sale Agreement, effective as of March 19, 2014 (the "**Loan Sale Agreement**").[92]  Pursuant to the Loan Sale Agreement, DL Solomon agreed to sell to PPR, and PPR agreed to purchase from DL Solomon, a portfolio of mortgage loans.[93]  The $23K Loan was among the mortgage loans identified for sale.[94]  While DL Solomon, itself, did not actually own the loans, DL Solomon effectively served as an intermediary in the transaction on behalf of Stelis.

---

[88] *See id.*, at pp.14-15 and 20.

[89] *See id.*, at p.14.

[90] *See* Plaintiffs Exh. 17, at p.6.

[91] *See id.*

[92] *See* D/PPR Exh. 7 (Loan Sale Agreement); Plaintiffs Exh. 18-1 (same).

[93] *See* Loan Sale Agreement § 2.1.

[94] *See id.*, Exh. A, at p.12 (listing loan information associated with the $23K Loan).  Of note, in 2012, prior to Solomon's outreach to PPR and PPR's entry into the Loan Sale Agreement, PPR and one of its affiliates had initiated litigation against DBI and certain of its affiliates (not including DBI VIII) in New York federal court.  The parties ended up entering into a settlement agreement in resolution of the litigation on March 22, 2013.  *See* Plaintiffs Exh. 17-8, at p.1 (caption) and ¶ 2.  Under the terms of the settlement, the DBI defendants conveyed certain loans to the PPR plaintiffs.  *See id.* ¶ 4.  At trial, Paulus explained that PPR did <u>not</u> acquire the $23K Loan from the DBI defendants

48.    Under the terms of the Loan Sale Agreement, the parties were to also execute a Bailee Agreement among DL Solomon, PPR, and a Custodian (defined as either Wells Fargo Bank, N.A. or U.S. Bank National Association).[95]   The Bailee Agreement was to be "one or more agreements in form and content satisfactory to Seller and Buyer, pursuant to which a party holding [a] Loan File (and any party holding a security interest in the related Loans) releases any security interest in the related Loans and releases control and possession of the Loan Files and the related Loans to Buyer, effective upon receipt of the Purchase Price."[96]   Accordingly, on or about March 19, 2014, DL Solomon, PPR, and Wells Fargo Bank, N.A. ("**Wells Fargo**") entered into a Bailee Agreement, dated March 19, 2014 (the "**Wells Fargo Bailee Agreement**").[97]   Here again, among the mortgage loans identified as applicable to the Bailee Agreement was the $23K Loan.[98]

49.    Among the documents required to be included in each Loan File was an endorsement to the note for the benefit of PPR and an assignment of the mortgage to PPR in recordable form.[99]  In the case of the note endorsement, the endorsement was to take the following form: "Pay to the order of _____ without recourse."[100]  Under the terms of the Loan Sale Agreement, if not provided at the time of the closing, DL Solomon had up to sixty days after the closing date to provide such documentation.[101]

---

pursuant to the settlement and that the loan transfer under the settlement agreement had absolutely nothing to do with the $23K Loan.

[95] *See id*. § 3.1; *see also id*. art. I (definition of "Custodian").

[96] *See id*. art. I (definition of "Bailee Agreement").

[97] *See* D/PPR Exh. 8 (Wells Fargo Bailee Agreement); Plaintiffs Exh. 18-2 (same).

[98] *See* Wells Fargo Bailee Agreement, Exh. B, Schedule 1, at p.13.

[99] *See* Loan Sale Agreement § 3.1 and Exh. C.

[100] *See id*. Exh. C ¶ 2.

[101] *See id*. § 3.1.

50.     On or about March 20, 2014, PPR paid the amount required under the Loan Sale Agreement to acquire the mortgage loans subject to the agreement, including the $23K Loan, and the transaction contemplated by the Loan Sale Agreement closed.[102]    Thus, on behalf of Stelis, DBI VIII gave the green light to RMG to prepare the requisite transfer documentation.

51.     Thus, on April 9, 2014, the following documents were executed, predicated upon the Fullum Resolution: (a) in relation to Stelis' transfer of the $23K Note to PPR, an Allonge to Note executed by Fullum, on behalf of Stelis, in blank in accordance with the requirements of the Loan Sale Agreement (the "**Stelis Endorsement**");[103] and (b) in relation to Stelis' assignment of the $23K Note Lien to PPR (the "**Stelis D/T Lien Assignment**"), a notarized Corporate Assignment of Deed of Trust, dated April 9, 2014, executed by Fullum on April 9, 2014, on behalf of Stelis, also in blank (the "**Stelis D/T Lien Assignment Instrument**").[104]    Of note, while the Stelis D/T Lien Assignment Instrument correctly referenced the date of the original $23K Note D/T, the date of the recording of the original $23K Note D/T, and the instrument number assigned to the recorded original $23K Note D/T, it incorrectly identified the book/reel/liber and page/folio numbers associated with the recording.

52.     The Stelis Endorsement and Stelis D/T Lien Assignment Instrument were provided to PPR.  PPR then engaged FCI Lender Servicing ("**FCI**") to service the $23K Loan.

53.     On May 2, 2014, FCI sent a letter to the Plaintiffs to provide notice of the transfer of the servicing of the $23K Loan to FCI, effective April 18, 2014.[105]    Shortly thereafter, FCI

---

[102] *See id.* art. I (defining "Closing Date" as March 20, 2014).

[103] *See* Plaintiffs Exh. 1-3 (Stelis Endorsement); D/PPR Exh. 44 (originally executed copy of Stelis Endorsement); Plaintiffs Exh. 17-5, at p.9.

[104] *See* Plaintiffs Exh. 8 (Stelis D/T Lien Assignment Instrument with handwritten additions); D/PPR Exh. 44 (originally executed copy of Stelis D/T Lien Assignment Instrument with handwritten additions).

[105] *See* Plaintiffs Exh. 17-11, at p.63.

followed up with a "Borrower Welcome Letter" to the Plaintiffs, dated May 6, 2014, in which FCI provided the following information with respect to the $23K Note: the unpaid principal balance of the note; the total amount of accrued unpaid interest; unpaid late charges; unpaid other charges; and, taking all of the foregoing amounts into account, the total amount of the outstanding debt owed – $29,763.71.[106]  The letter also informed the Plaintiffs that, unless the debt was disputed within thirty days, the debt would be assumed to be valid.[107]

### G. PPR Marshals the Endorsement and Assignment Documentation And Records the Deed of Trust Assignments

54.    After the Plaintiffs failed to pay or contest the outstanding balance reflected in the "Borrower Welcome Letter," PPR began to ready things for the pursuit of collection.  In this regard, on July 22, 2014, Pati Cruz ("**Cruz**"), the Asset Manager for PPR, reached out to PPR's legal counsel, Riley Nix ("**Nix**") of the Law Office of Riley Nix (the "**Nix Law Firm**"), to request that Nix put together a formal demand letter to the Plaintiffs.[108]  In making the request, Cruz noted that an "Assignment [was] in the process of being recorded."[109]  Nix followed up with a request for the documents that he would need.[110]

55.    Eventually, PPR obtained the originally-executed: (a) $23K Note (with the Sebring Endorsement and First RFC Endorsement), BONY Endorsement, Second RFC Endorsement, $23K Note D/T, Sebring D/T Lien Assignment Instrument, and Original BONY & RFC Assignment Instruments from Wells Fargo pursuant to the terms of the Wells Fargo Bailee

---

[106] *See id.*, at p.59.

[107] *See id.*

[108] *See* Plaintiffs Exh. 9.

[109] *See id.*

[110] *See id.*

Agreement; and (b) Stelis Endorsement and Stelis D/T Lien Assignment Instrument from either Wells Fargo pursuant to the terms of the Wells Fargo Bailee Agreement or DL Solomon.

56.     PPR then had to decide what to do with the Original BONY & RFC Assignment Instruments and the Stelis D/T Lien Assignment Instrument.  PPR could either record them as is and then permissibly follow them up with the filing of correction instruments,[111] or it could potentially impermissibly modify the instruments to address the errors and omissions and then file the modified instruments.  PPR opted for the latter option.

57.     First, in the case of the Original BONY & RFC Assignment Instruments, PPR (i) crossed out "Dallas" as the county of recordation of the original $23K Note D/T and handwrote in "Tarrant", and (ii) added the language "and also see attached Exhibit A" after the legal description statement "As Referenced on Original Recorded Document" and then added a new Exhibit A with the legal description of the Property.  Then, on July 28, 2014, the modified Original BONY & RFC Assignment Instruments were recorded in the Tarrant County, Texas property records (the "**Recorded BONY D/T Lien Assignment Instrument**" and "**Recorded RFC D/T Lien Assignment Instrument**").[112]

58.     Second, in the case of the Stelis D/T Lien Assignment Instrument, PPR (i) handwrote in its name and address as the assignee, and (ii) crossed out the existing book/reel/liber and page/folio numbers and wrote in new numbers.  Then, on July 28, 2014, the modified Stelis D/T Lien Assignment Instrument was recorded in the Tarrant County, Texas property records (the "**Recorded Stelis D/T Lien Assignment Instrument**").[113]

---

[111] *See* Tex. Prop. Code §§ 5.027(a), 5.028, and 5.030(a)-(b).

[112] *See* Plaintiffs Exh. 6 (Recorded BONY D/T Lien Assignment Instrument); D/PPR Exh. 44 (originally-executed Recorded BONY D/T Lien Assignment Instrument); Plaintiffs Exh. 7 (Recorded RFC D/T Lien Assignment Instrument); D/PPR Exh. 44 (originally-executed Recorded RFC D/T Lien Assignment Instrument).

[113] *See* Plaintiffs Exh. 8 (Recorded Stelis D/T Lien Assignment Instrument); D/PPR Exh. 44 (originally-executed Recorded Stelis D/T Lien Assignment Instrument).

### H.    The Business Relationship Among the Stelis-Related Parties Sours

59.    In agreeing to set up Stelis, Weinstein, Palmer, and Andrews understood that, through DBI, Palmer and Andrews would be sourcing mortgage loan portfolios for potential acquisition by Stelis with financing to be supplied by Weinstein affiliates, particularly Oak Harbor. As part of that process, Palmer and Andrews, through DBI/DBI VIII, would model out how each particular portfolio was projected to perform financially and Palmer and Andrews agreed to provide personal guarantees with respect to the financing advanced to Stelis to acquire the troubled loan portfolios.[114]

60.    On June 4, 2014, Stelis, under the direction of Ophrys, sent a "Notice of Portfolio Shortfall and Default" to Palmer and Andrews, indicating that Stelis had not received sufficient receipts to pay all amounts then due and owing to the Weinstein affiliate that financed the portfolio at issue.[115]  The notice requested that Palmer and Andrews cure the shortfall.[116]

61.    Thereafter, on June 10, 2014, Palmer, Andrews, DBI, DBI VIII, and Oak Harbor entered into a letter agreement that detailed how portfolio shortfalls would be handled.[117] Thereafter, however, the portfolio shortfalls persisted.[118]

62.    Eventually, on December 1, 2014, Palmer, Andrews, and DBI filed suit against Weinstein, Oak Harbor, Ophrys, Cerastes, and Stelis in New York federal court.[119]

63.    Having been named in the lawsuit, Weinstein launched a number of counterattacks. First, he caused Ophrys, as the Manager of Stelis, to terminate DBI VIII as the Mortgage Servicer

---

[114] *See* Plaintiffs Exh. 17-9 ¶ 23.

[115] *See id*. ¶ 27; *see also* Plaintiffs Exh. 17-10 ¶ 93.

[116] *See* Plaintiffs Exh. 17-9 ¶ 27.

[117] *See id*. ¶ 28.

[118] *See id*. ¶ 29.

[119] *See id*., at p. 1 (caption) and ¶ 30.

of Stelis, effective February 24, 2015.[120]  Second, he caused Ophrys, as the Manager of Stelis, to, pursuant to a letter dated May 11, 2015, terminate Palmer as an authorized representative of Stelis.[121]  Finally, in declaration testimony, Weinstein asserted, among other things, that Palmer and Andrews had orchestrated the sale of certain Stelis assets without notice to, or the approval of, Ophrys, and that Palmer and Andrews had diverted certain sales proceeds to their own use.[122]  Of note, none of the disputed sales specifically identified by Weinstein involved the $23K Loan or the portfolio of loans acquired by PPR in which it was included.[123]  Additionally, while Weinstein complained about additional unauthorized sales activity in 2016, that was well after PPR's acquisition of the $23K Loan.[124]

64.    In connection with the Adversary Proceeding, Plaintiffs' counsel elicited further declaration and deposition testimony from Weinstein in the nature of challenges to actions taken by Palmer.  For example, Weinstein took issue with Palmer's authority to make the appointments set forth within the Fullum Resolution, claiming that only Ophrys (his entity) had the authority to take such action.[125]  Based upon the same, Weinstein also took issue with Fullum's authority to execute the Stelis Endorsement and Stelis D/T Lien Assignment Instrument on behalf of Stelis.[126]

65.    That said, no evidence was presented at trial of the end result of the litigation between Stelis-related parties.  Additionally, no evidence was presented of any legal action having ever been taken by Stelis to challenge or seek to avoid, nullify, or in any other way affect the

---

[120] *See id*. ¶ 12.

[121] *See id*. ¶ 14.

[122] *See id*. ¶¶ 34-35; Plaintiffs Exh. 16-5 ¶ 35.

[123] *See* Plaintiffs Exh. 17-9 ¶¶ 36-39.

[124] *See id*. ¶¶ 43-50.

[125] *See* Plaintiffs Exh. 16-4 ¶¶ 6-7.

[126] *See id*. ¶¶ 8-9.

transfers memorialized by the Stelis Endorsement and Stelis D/T Lien Assignment Instrument. Therefore, it is questionable whether any weight should be given to Weinstein's statements.

## I.    PPR Pursues Collection Against the Plaintiffs

66.    Ultimately, on April 12, 2017, the Nix Law Firm, on behalf of PPR, sent a formal notice of default and demand for payment letter to the Plaintiffs with respect to the $23K Loan.[127] Pursuant to the demand letter, notice was provided to the Plaintiffs of the following unpaid indebtedness in relation to the $23K Loan as of March 28, 2017: an unpaid principal balance of $12,805.61; unpaid accrued interest of $20,952.14 (with interest continuing to accrue at the rate of 14.990% per annum – or $5.26 per diem); unpaid late fees of $2,135.30; and reasonable attorney's fees incurred in connection with pursuing payment.  Notice was further provided that, in the absence of payment by May 2, 2017, PPR intended to accelerate all indebtedness associated with the $23K Loan and pursue remedies.[128]

67.    On May 1, 2017, the Plaintiffs sent a responsive letter to the Nix Law Firm to dispute the demand letter.[129]  The Plaintiffs highlighted their understanding that, in connection with the Loan Mod Agreement process, the $23K Loan had been charged off.[130]  Thereafter, the Plaintiffs additionally or alternatively asserted to the Nix Law Firm that the $23K Loan had been "renewed into [the] first lien loan" as part of the Loan Mod Agreement.[131]

68.    After reviewing all filed documents of record in relation to the $23K Loan, the Nix Law Firm sent a follow-up letter to the Plaintiffs, dated May 11, 2017, wherein it explained that it

---

[127] *See* Plaintiffs Exh. 10; *see also* Joint Stipulations ¶ 5.

[128] *See id.*

[129] *See* Plaintiffs Exh. 11; *see also* Joint Stipulations ¶ 6.

[130] *See id.*

[131] *See* D/PPR Exh. 16, at p.2 (recapping prior communications between the Plaintiffs and the Nix Law Firm).

had not discovered any records substantiating the Plaintiffs' claim.  The Nix Law Firm then relayed the matter to FCI, PPR's loan servicer, for further follow-up and investigation.

69.    On June 8, 2017, FCI sent a "Response to Debt Dispute" letter to the Plaintiffs.[132] On behalf of PPR, FCI requested the Plaintiffs to provide the loan modification paperwork and proof of the claimed lien release associated with the loan.[133]  The Plaintiffs provided the Loan Mod Agreement to FCI.  After its receipt of the same, FCI provided the documentation to the Nix Law Firm.

70.    Thereafter, on July 20, 2017, the Nix Law Firm sent follow-up correspondence to the Plaintiffs, explaining that the Loan Mod Agreement did not substantiate their assertion of a release of the lien associated with the $23K Loan or the renewal of the $23K Loan into the senior $132K Loan as part of the Loan Mod Agreement.[134]  Once again, the Plaintiffs responded to the Nix Law Firm correspondence, this time disputing the debt on the alleged basis of the $23K Loan having been consolidated with the $132K Loan by Homecomings as part of the loan modification process.[135]  By letter dated August 4, 2017, the Nix Law Firm requested the Plaintiffs to supply the supporting Homecomings correspondence.[136]  In response, the Plaintiffs provided a partially redacted copy of the Homecomings Loan Mod Approval Letter.[137]  In reply, the Nix Law Firm requested an unredacted copy of the letter.[138]  It is unclear if the Plaintiffs ever complied with the request.

---

[132] *See* Plaintiffs Exh. 12.

[133] *Id.*

[134] *See* D/PPR Exh. 16; *see also* Joint Stipulations ¶ 6.

[135] *See* D/PPR Exh. 17 (recapping prior communications between the Plaintiffs and the Nix Law Firm).

[136] *See id.* (recapping prior communications between the Plaintiffs and the Nix Law Firm).

[137] *See id.* (referencing the same).

[138] *See id.*

71.     In the meantime, on October 9, 2017, PPR executed an Appointment of Substitute Trustee instrument to appoint Nix as one of the substitute trustees (in such capacity, the "**Substitute Trustee**") under the $23K Note D/T.[139]  The instrument was thereafter notarized on October 16, 2017, and recorded in the property records for the Property on October 17, 2017.[140]

72.     Then, on October 17, 2017, the Nix Law Firm sent a formal notice of acceleration of the $23K Loan and of the Substitute Trustee's posting of the Property for a foreclosure sale to occur on November 7, 2017.[141]  The Notice of Substitute Trustee's Sale was recorded in the property records for the Property on October 18, 2017.[142]

### J.     The Plaintiffs File Suit Against PPR and Obtain the First TRO Order

73.     On November 3, 2017, prior to the scheduled foreclosure sale, the Plaintiffs commenced litigation against PPR in the 153rd Judicial District Court of Tarrant County, Texas, under Cause No. 153-296093-17 (the "**State District Court Case**"), with the filing of *Plaintiff's [sic] Petition for TRO and Order Setting Hearing for Temporary Injunction* (the "**First State Court Petition**").[143]  Pursuant to the First State Court Petition, the Plaintiffs requested, among other things, the issuance of a temporary restraining order ("**TRO**").[144]

74.     On November 6, 2017, the state court granted the Plaintiffs' TRO request and entered a *Temporary Restraining Order and Order Setting Hearing for Permanent Injunction* (the "**First TRO**").[145]  Pursuant to the terms of the First TRO, the Substitute Trustee was enjoined from

---

[139] *See* D/PPR Exh. 18.

[140] *See id.*

[141] *See* D/PPR Exh. 11; *see also* Joint Stipulations ¶ 7.

[142] *See* D/PPR Exh. 12.

[143] *See* D/PPR Exh. 22 (First State Court Petition); *see also* Joint Stipulations ¶ 11.

[144] *See* First State Court Petition, at p.6.

[145] *See* D/PPR Exh. 23 (First TRO).

conducting the foreclosure sale during the term of the order (which the Court recognized as extending until November 17, 2017) and the hearing on the Plaintiffs' request for a temporary injunction was scheduled for November 17, 2017.[146]

75.    Thereafter, once PPR learned of the First TRO, it requested a continuance of the temporary injunction hearing.  The state court granted the request, continuing the hearing to December 15, 2017, and extending the injunctive provisions of the First TRO until such hearing.[147] For whatever reasons, however, the continued December 15, 2017, temporary injunction hearing never took place and the First TRO expired.[148]  Later, on January 19, 2018, Plaintiffs filed a *Motion to Issue Permanent Injunction* in the State District Court Case.[149]  But the motion was never set for hearing.[150]

### K.    PPR Pursues a Second Foreclosure; The Plaintiffs Again Attempt to Prevent the Foreclosure

76.    Consequently, the Substitute Trustee thereafter executed a new Notice of Substitute Trustee's Sale, dated May 10, 2018, pursuant to which notice was provided of a foreclosure sale of the Property scheduled for June 5, 2018.[151]  The new Notice of Substitute Trustee's Sale was timely and properly served on the Plaintiffs and timely recorded in the property records for the Property.[152]

77.    In response, on May 24, 2018, the Plaintiffs filed *Plaintiff's [sic] Second Petition for TRO and Order Setting Hearing for Permanent Injunction* in the State District Court Case (the

---

[146] *See id.*, at p.2.

[147] *See* D/PPR Exhs. 24 and 25.

[148] *See* D/PPR Exh. 21 (State District Court Case Docket).

[149] *See* D/PPR Exh. 26.

[150] *See* D/PPR Exh. 21 (State District Court Case Docket).

[151] *See* D/PPR Exh. 13; *see also* Joint Stipulations ¶ 12.

[152] *See* Plaintiffs Exh. 17-4 ¶ 14; D/PPR Exh. 13; *see also* Joint Stipulations ¶ 12.

"**Second State Court Petition**").[153]   On the same date, May 24, 2018, the state court entered a *Temporary Restraining Order and Order Setting Hearing for Permanent Injunction* (the "**Second TRO**").[154]   Pursuant to the terms of the Second TRO, the Substitute Trustee was enjoined from conducting the foreclosure sale "until such time as this court has a hearing on the matter."[155]   The state court set the hearing on Plaintiffs' request for a temporary injunction for June 7, 2018.[156]

78.    The following day, on May 25, 2018, however, the state court entered an *Amended Temporary Restraining Order and Order Setting Hearing for Permanent Injunction* (the "**Third TRO**").[157]   Like the Second TRO, the Third TRO enjoined the Substitute Trustee from conducting the foreclosure sale "until such time as this court has a hearing on the matter."[158]   In the Third TRO, however, the state court set the hearing on Plaintiffs' request for a temporary injunction for June 5, 2018, and noted that the order would expire <u>on</u> June 5, 2018.[159]

79.    On June 4, 2018, the day before the temporary injunction hearing, the Plaintiffs filed a *Motion to Extend TRO Deadline* pursuant to Plaintiffs claimed to have experienced some sort of misunderstanding with the state court clerk necessitating "an extension" of the "TRO Deadline for 14 days, pursuant to TRCP 680."[160]   On June 5, 2018, the state court entered the Plaintiffs' proposed *Order to Extend Temporary Restraining Order* (the "**Hearing Continuance Order**").[161]   While the Hearing Continuance Order reset the temporary injunction hearing to June

---

[153] *See* D/PPR Exh. 27 (Second State Court Petition).

[154] *See* D/PPR Exh. 28 (Second TRO).

[155] *See* Second TRO, at p.1.

[156] *See id.*, at p.2.

[157] *See* D/PPR Exh. 29 (Third TRO).

[158] *See* Third TRO, at p.1.

[159] *See id.*, at p.2.

[160] *See* D/PPR Exh. 31; *see also* Tex. R. Civ. P. 680 (permitting a non-consensual extension of the term of a TRO for a period of no more than 14 days for good cause shown).

[161] *See* D/PPR Exh. 32.

21, 2018, nowhere within the order was there any reference to an extension of the injunctive relief provided pursuant to the Third TRO or a modification of the TRO termination language of the Third TRO.[162]  Instead, the Hearing Continuance Order provided that "[t]he purpose of the hearing shall be to determine whether _this_ _temporary restraining order_ should be made a permanent injunction pending a full trial on the merits."[163]  That said, the Hearing Continuance Order is not, itself, a TRO and there was no injunctive language set forth within the order.

80.    Consequently, upon termination of the Third TRO on 12:00:01 a.m. on June 5, 2018, neither PPR nor the Substitute Trustee was enjoined from moving forward with the noticed foreclosure sale of the Property.

## L.    *The Foreclosure Sale Takes Place and Arbelaez Investments Purchases the Property*

81.    Arbelaez Investments is a real estate investment company.  David Arbelaez ("**Arbelaez**") is the founder and President of Arbelaez Investments.  Arbelaez Investments looks for real property acquisition opportunities in advantaged situations, such as foreclosure sales.  As of the time of trial, it owned eight different properties.

82.    Arbelaez Investments found out about the Property through its normal foreclosure research process.  In undertaking the research, Arbelaez Investments became aware of the first priority lien in the Property – _i.e._, the $132K Note Lien – and, thus, understood that the sale would be subject to this first priority lien, which would continue to encumber the Property.  Nevertheless, Arbelaez Investments remained interested in participating in the foreclosure.

83.    What Arbelaez Investments was _not_ aware of, however, was the pending litigation between the Plaintiffs and PPR or of any of the issues that have since been raised by the Plaintiffs

---

[162] *See id*.

[163] *See id*. (emphasis added).

with respect to the integrity of documentation evidencing transfer of the $23K Note and $23K Note Lien.  It had had no prior involvement with PPR, the Plaintiffs, or the Substitute Trustee.

84.    On June 5, 2018, the Substitute Trustee conducted the foreclosure sale of the Property.  Including Arbelaez Investments, there were five to six active bidders at the foreclosure. The bidding started in the $20,000 range, aligned with the outstanding debt under the $23K Loan. Through competitive bidding, however, the price was bid up and, ultimately, Arbelaez Investments emerged as the successful bidder with a final bid of $49,000.[164]

85.    On June 5, 2018, upon Arbelaez Investments' payment of the $49,000 purchase price to the Substitute Trustee, the Substitute Trustee issued a Foreclosure Sale Deed to Arbelaez Investments which, on June 7, 2018, was recorded under Instrument No. D218123087 in the Official Public Records of Tarrant County, Texas (the "**Foreclosure Sale Deed**").[165]

**M.    *Arbelaez Investments Takes Action to Evict the Plaintiffs;***
***The Plaintiffs Attack the Foreclosure and Attempt to Prevent the Eviction***

86.    According to Mrs. Billups, on June 6, 2018, the Plaintiffs were served with a demand by, or on behalf of, PPR to vacate the Property.  The Plaintiffs were caught entirely off guard by the notice, believing that a TRO was still in place.

87.    After learning of the foreclosure sale, on June 28, 2018, the Plaintiffs filed *Plaintiff's [sic] Emergency Petition to Set Aside Void Trustee's Sale for Fraud, for Violation of TRO, and for Damages and Attorneys Fees* (the "**Foreclosure Avoidance Petition**") in the State District Court Case.[166]  Pursuant to the Foreclosure Avoidance Petition, the Plaintiffs sought to

---

[164] *See* D/PPR Exh. 14, p.2.

[165] *See* D/PPR Exh. 14 (Foreclosure Sale Deed); *see also* Joint Stipulations ¶ 13.

[166] *See* D/PPR Exh. 33 (Foreclosure Avoidance Petition).

have the foreclosure sale set aside and nullified.  However, the Plaintiffs did not name Arbelaez Investments as a defendant in the Foreclosure Avoidance Petition.

88.     Thereafter, in July 2018, the Plaintiffs engaged new counsel and on August 14, 2018, filed an amended petition (the "**First Amended Foreclosure Avoidance Petition**").[167]

89.     Separately, on February 19, 2019, Arbelaez Investments commenced an eviction action against the Plaintiffs in the Justice of Peace Court No. 7 of Tarrant County, Texas, under Case No. JP07-19-E000916121 (the "**First Eviction Case**").[168]   On March 7, 2019, Arbelaez Investments obtained a default judgment against the Plaintiffs for possession of the Property (the "**First Eviction Judgment**").[169]

90.     On March 11, 2019, the Plaintiffs filed an appeal from the First Eviction Judgment, resulting in the initiation of a *de novo* proceeding in County Court at Law No. 1 of Tarrant County, Texas, under Case No. 2019-002120-1 (the "**Second Eviction Case**").[170]

91.     On April 9, 2019, an order was entered in the Second Eviction Case setting the case for trial.[171]

*N.*     ***The Second Bankruptcy Case is Filed***

92.     On April 24, 2019, prior to the trial setting in the Second Eviction Case, Mrs. Billups filed a voluntary petition with the Bankruptcy Court for relief under chapter 7 of the Bankruptcy Code, thereby initiating Case No. 19-41645 (the "**Second Bankruptcy Case**").[172]   The

---

[167] *See* D/PPR Exh. 21 (State District Court Case Docket).

[168] *See* docket of the First Eviction Case (the "**First Eviction Case Docket**"), of which judicial notice is taken.

[169] *See* First Eviction Case Docket.

[170] *See* First Eviction Case Docket; *see also* docket of the Second Eviction Case (the "**Second Eviction Case Docket**"), of which judicial notice is taken.

[171] *See* Second Eviction Case Docket.

[172] *See* docket of Second Bankruptcy Case (the "**Second Bankruptcy Case Docket**"), of which judicial notice is taken.

filing of the Second Bankruptcy Case caused the Second Eviction Case to be stayed pursuant to

11 U.S.C .§ 362(a) (the "**Automatic Stay**").[173]

93.     On May 17, 2019, Arbelaez Investments filed a motion for relief from the

Automatic Stay.[174]  While initially opposed to the motion, Mrs. Billups later reached agreement

with Arbelaez Investments on the terms of an agreed order, and on June 28, 2019, the Bankruptcy

Court entered an agreed order in resolution of the lift stay motion.  Pursuant to the agreed order,

Arbelaez Investments was permitted to resume prosecution of the Second Eviction Case, but not

until August 1, 2019.[175]

**O.     The State District Court Case and Second Eviction Case Resume**

94.     On July 16, 2019, prior to Arbelaez Investments having the right to resume activity

in the Second Eviction Case, the Plaintiffs filed a motion in the State District Court Case to request

transfer of the State District Court Case to County Court at Law No. 1 for consolidation into the

Second Eviction Case.[176]  While the motion was set for hearing on September 12, 2019, for

whatever reasons the hearing never took place.[177]

95.     Instead, on August 5, 2019, an order was entered in the Second Eviction Case

setting the case for a bench trial on November 5, 2019.[178]

96.     Thereafter, on October 29, 2019, following the appearance of yet another attorney

for the Plaintiffs, the Plaintiffs filed a second amended petition in the State District Court Case

---

[173] *See* 11 U.S.C. § 362(a)(1).  While the filing of the Second Bankruptcy Case did not stay the State District Court Case (because the only claims asserted in the State District Court Case were claims *by* the Plaintiffs, as opposed to claims *against* the Plaintiffs), all action in the State District Court Case seemingly came to a grinding halt upon the filing of the Second Bankruptcy Case.  *See* D/PPR Exh. 21 (State District Court Case Docket).

[174] *See* Second Bankruptcy Case Docket No. 7.

[175] *See* Second Bankruptcy Case Docket No. 14.

[176] *See* D/PPR Exh. 21 (State District Court Case Docket).

[177] *See id.*

[178] *See* Second Eviction Case Docket.

(the "**Second Amended Foreclosure Avoidance Petition**").[179]  In conjunction with the Second Amended Foreclosure Avoidance Petition, the Plaintiffs included an application for a temporary injunction.[180]

97.    On November 5, 2019, prior to consideration of the temporary injunction request, the trial was conducted in the Second Eviction Case.  At the conclusion of the trial on November 5, 2019, judgment was entered in favor of Arbelaez Investments (the "**Second Eviction Judgment**").[181]  The Plaintiffs did not appeal the Second Eviction Judgment.

98.    Following entry of the Second Eviction Judgment, the Plaintiffs elected to nonsuit the State District Court Case and an order of nonsuit was entered on November 21, 2019.[182]

99.    On November 15, 2019, based upon the Second Eviction Judgment, Arbelaez Investments filed a request for issuance of a writ of possession.  On the same date, a writ of possession was issued for execution.[183]

## P.    The Third Bankruptcy Case is Filed

100.    Prior to execution of the writ of possession,[184] the Plaintiffs engaged new bankruptcy counsel and filed the current Bankruptcy Case.[185]  As a result of the filing and imposition of the Automatic Stay, execution of the writ of possession was stayed.[186]

---

[179] *See* D/PPR Exh. 21 (State District Court Case Docket).

[180] *See id.*

[181] *See id.*

[182] *See id.*

[183] *See id.*

[184] And, curiously, also prior to conclusion of the Second Bankruptcy Case.

[185] *See* docket of Bankruptcy Case (the "**Bankruptcy Case Docket**"), of which judicial notice is taken.

[186] *See* 11 U.S.C. § 362(a)(1).

101.    On December 30, 2019, Arbelaez Investments filed a motion for relief from the Automatic Stay.[187]  The Plaintiffs opposed the motion, asserting that the lien that was foreclosed was not a valid lien.[188]  On January 15, 2020, the Bankruptcy Court conducted a hearing on the motion, at the conclusion of which the Bankruptcy Court overruled the Plaintiffs' objection and indicated that the lift stay motion would be granted.[189]  In accordance with the ruling, on February 5, 2020, the Bankruptcy Court entered an *Order Granting Motion for Relief from Stay Filed by Arbelaez Investments, LLC* (the "**Final Lift Stay Order**").

102.    In the face of the Final Lift Stay Order, the Plaintiffs launched a multifaceted effort to prevent the eviction from being effectuated.

103.    First, on February 11, 2020, the Plaintiffs initiated the current Adversary Proceeding.  Then, on February 12, 2020, the next day, the Plaintiffs filed a motion to request entry of a TRO preventing Arbelaez Investments from pursuing the eviction.[190]  On February 18, 2020, the Bankruptcy Court conducted a hearing on the motion, at the conclusion of which the motion was denied based upon the proceedings that had already taken place in state court.[191]

104.    Second, on February 19, 2020, the Plaintiffs filed both a motion for reconsideration of the Final Lift Stay Order and a notice of appeal from the Final Lift Stay Order in the Bankruptcy Case.[192]  On March 12, 2020, the Bankruptcy Court entered an order denying the motion for

---

[187] *See* Bankruptcy Case Docket No. 14.

[188] *See* Bankruptcy Case Docket No. 23.

[189] *See* Bankruptcy Case Docket (1/15/2020 docket entry).

[190] *See* Adv. Docket Nos. 1 and 6.

[191] *See* docket of Adversary Proceeding (2/18/2020 docket entry).  The denial was later memorialized in an order entered on April 17, 2020.  *See* Adv. Docket No. 25.

[192] *See* Bankruptcy Case Docket Nos. 34 and 35.

reconsideration.[193]    Thereafter, on August 13, 2020, the District Court entered an order and judgment affirming the Final Lift Stay Order.[194]   No further appeal was pursued by the Plaintiffs.

105.    Finally (and oddly), on February 20, 2020, the Plaintiffs filed a notice of appeal from the Final Lift Stay Order *in the Second Eviction Case*.[195]   On April 30, 2020, the Texas Court of Appeals understandably dismissed the appeal for want of jurisdiction.[196]

## Q.    *The Plaintiffs are Evicted from the Property*

106.    On February 20, 2020, following the denial of the Plaintiffs' request for a TRO in the Adversary Proceeding, Arbelaez Investments again requested issuance of a writ of possession in the Second Eviction Case.[197]   The writ was issued and provided to the Constable's Office (Precinct 7) of Tarrant County, Texas, for execution.[198]

107.    On the same date, February 20, 2020, the Constable's Office executed the writ.  The actual eviction process was less than ideal.  Among other things, according to Mrs. Billups, the cremation remains of the Plaintiffs' son were mishandled, several semi-pro football championship rings of the Plaintiffs' son went missing, and certain furniture was damaged.  Coupled with the embarrassment and stress of having to immediately find a new place to move, the Plaintiffs also suffered both immediate and prolonged negative health effects and conditions.  In the case of Mrs. Billups, not only did she end up spending several days in the hospital, but she has since suffered on a more permanent basis as a result of constant anxiousness, a lack of trust in others, shortness

---

[193] *See* Bankruptcy Case Docket No. 54.

[194] *See* Bankruptcy Case Docket No. 106.

[195] *See* Second Eviction Case Docket.

[196] *See Billups v. Arbelaez Invs., LLC*, No. 02-20-00066-CV, 2020 WL 2073744 (Tex. App. – Fort Worth Apr. 30, 2020, no pet.).

[197] *See* Second Eviction Case Docket.

[198] *See id.*

of temper, and sleeplessness.  Mr. Billups has also suffered from anxiousness and weariness, and occasionally experiences stomach problems.

### _Proposed Conclusions of Law_[199]

**A.    _Request To Remove Cloud on Title / To Quiet Title (Count 1)_**

108.    Pursuant to Count 1 of the Amended Complaint, the Plaintiffs request that certain deed of trust lien assignments, as well as the Foreclosure Sale Deed, be declared invalid.  The Plaintiffs characterize the request as a claim to remove a cloud on title and to quiet title.  While they have presented the request pursuant to the Texas Uniform Declaratory Judgments Act (the "**TUDJA**"),[200] the TUDJA has no application in federal court.[201]  Instead, requests for declaratory relief in federal court are governed by the federal Declaratory Judgment Act found at 28 U.S.C. § 2201 (the "**FDJA**").[202]  Therefore, the request will be deemed to have been made under the FDJA instead of the TUDJA.

109.    Pursuant to the FDJA, "[i]n a case of actual controversy within its jurisdiction, … any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."[203]  Because of the discretionary language used within the FDJA, the

---

[199] To the extent any of the following proposed conclusions of law are more appropriately categorized as proposed findings of fact or include proposed findings of fact, they should be deemed as such.

[200] _See_ Tex. Civ. Prac. & Rem. Code § 37.001, _et seq_. (the TUDJA).  The Plaintiffs appear to hinge their request on TUDJA § 37.004, which provides that a person interested under a deed may have determined any question of validity arising under the instrument and obtain a declaration of rights, status, or other legal relations thereunder.  _See id._ § 37.004(a).

[201] _Edionwe v. Bailey_, 860 F.3d 287, 294 n.2 (5th Cir. 2017) (quoting _i2 Techs. US, Inc. v. Lanell_, No. CIV.A. 302CV0134G, 2002 WL 1461929, at *7 n.5 (N.D. Tex. July 2, 2002)), _cert. denied_, 583 U.S. 1057 (2018); _see also Redwood Resort Props., LLC v. Holmes Co. Ltd._, Civil Action No. 3:06-CV-1022-D, 2007 WL 1266060, at *4 (N.D. Tex. Apr. 30, 2007).

[202] _See_ 28 U.S.C. § 2201.

[203] _Id._ § 2201(a).

FDJA has been construed as an authorization, not a command, and "[f]ederal courts have broad discretion to grant or refuse declaratory judgment."[204]

### 1.    Nature of Claim and Elements

110.    A claim to quiet title is an equitable claim. "The quiet-title suit exists 'to enable the holder of the feeblest equity to remove from his way to legal title any unlawful hindrance having the appearance of better right.'"[205]  "The plaintiff in a quiet-title suit 'must prove, as a matter of law, that he has a right of ownership and that the adverse claim is a cloud on the title that equity will remove.'"[206]  Thus, "[t]he elements of a suit to quiet title are (1) the plaintiff has an interest in a specific property, (2) title to the property is affected by a claim by the defendant, and (3) the defendant's claim, though facially valid, is invalid or unenforceable."[207]

111.    In relation to the first element, while the Plaintiffs no longer hold an interest in the Property as a result of the foreclosure sale, the whole point of this action is to challenge the validity of the foreclosure sale.  Therefore, looking to the state of affairs as of the foreclosure sale, the Plaintiffs held title to the Property pursuant to the Special Warranty Deed, thereby establishing the first element.

112.    In relation to the second element, in the case of Arbelaez Investments, its claim of ownership to the Property based upon the Foreclosure Sale Deed constitutes an adverse claim to title of the Property, thereby satisfying the second element.  In the case of PPR, while PPR is not currently claiming to hold any interest in the Property, the Plaintiffs seek to challenge PPR's

---

[204] *Redwood Resort Props., LLC*, 2007 WL 1266060, at *4 (citing *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995) and *Torch, Inc. v. LeBlanc*, 947 F.2d 193, 194 (5th Cir. 1991)).

[205] *Lance v. Robinson*, 543 S.W.3d 723, 739 (Tex. 2018) (quoting *Bell v. Ott*, 606 S.W.2d 942, 952 (Tex. Civ. App. – Waco 1980, writ ref'd n.r.e.) (quoting *Thomson v. Locke*, 1 S.W. 112, 115 (1886))).

[206] *Robinson*, 543 S.W.3d at 739 (quoting *Essex Crane Rental Corp. v. Carter*, 371 S.W.3d 366, 388 (Tex. App. – Houston [1st Dist.] 2012, pet. denied)).

[207] *Heredia v. Zimprich*, 559 S.W.3d 223, 233 (Tex. App. – El Paso 2018, no pet.).

previously asserted status as the holder of the $23K Note Lien upon which the foreclosure sale was predicated. Therefore, the second element is established in relation to PPR as well.

113.    Finally, with respect to the third element, the Plaintiffs assert that each of the following lien assignments is invalid and unenforceable, and that they were invalid and unenforceable as of the time of the foreclosure sale involving the Property:

(1) the BONY D/T Lien Assignment memorialized by the BONY D/T Lien Assignment Instrument and Recorded BONY D/T Lien Assignment Instrument;

(2) the RFC D/T Lien Assignment memorialized by the RFC D/T Lien Assignment Instrument and Recorded RFC D/T Lien Assignment Instrument; and

(3) the Stelis D/T Lien Assignment memorialized by the Stelis D/T Lien Assignment Instrument and Recorded Stelis D/T Lien Assignment Instrument.

Based upon the alleged invalidity of one or more of the foregoing assignments, the Plaintiffs further assert that the Foreclosure Sale Deed is correspondingly invalid and unenforceable. Additionally, the Plaintiffs assert that there was no amount owed under the $23K Note because of the alleged charge-off of the $23K Loan at the time of the Loan Mod Agreement. Therefore, even if PPR was validly assigned the $23K Note D/T and $23K Note Lien, there was no legal basis upon which to have conducted the foreclosure.

## 2.    *Validity of the Deed of Trust Lien Assignments*

114.    In response to the lien assignment assertions, the Defendants not only dispute the invalidity/unenforceability arguments advanced by the Plaintiffs, they also challenge the Plaintiffs' standing to pursue certain aspects of the challenges. Second, in response to the $23K Loan charge-off arguments, the Defendants assert that the Plaintiffs have failed to present any evidence of the release of the Plaintiffs' obligations under the $23K Note.

### (a) The Plaintiffs' Standing

115.    Under established Texas law, "[b]orrowers have limited standing to challenge their lenders' assignments of their promissory notes and DOTs [deeds of trust]."[208]  While "an obligor cannot defendant against an assignee's efforts to enforce the obligation on a ground that merely renders the assignment *voidable* at the election of the *assignor*, Texas courts follow the majority rule that the obligor *may* defend 'on any ground which renders the assignment void.'"[209]  Thus, here, the Plaintiffs have standing to challenge the validity/enforceability of each of the specified deed of trust lien assignments on voidness grounds, but not on voidability grounds.  This makes imminent sense because where the transfers are not outright void, disputes with respect to the validity and enforceability of such transfers are really just disputes between the putative transferors and transferees.[210]

116.    Whether a deed (or a deed of trust or an assignment of deed of trust) is void or voidable depends upon the effect of the deed (or deed of trust or assignment) upon the existing title to the real property at the time it was executed and delivered.  "If it was a mere nullity, passing no title and conferring no rights whatsoever, it was absolutely void, but if it passed title [or an interest in property]… subject only to the right of [the grantor] to have it set aside upon proof that the sale [or assignment] was improperly made, then it was merely voidable."[211]

---

[208] *Ferguson v. Bank of New York Mellon Corp.*, 802 F.3d 777, 780 (5th Cir. 2015).

[209] *Reinagel v. Deutsche Bank Nat'l Trust Co.*, 735 F.3d 220, 225 (5th Cir. 2013) (emphasis added in part, and in orig. in part) (quoting *Tri-Cities Constr., Inc. v. American Nat'l Ins. Co.*, 523 S.W.2d 426, 430 (Tex. Civ. App. – Houston [1st Dist.] 1975, no writ)).

[210] *See Nobles v. Marcus*, 533 S.W.2d 923, 927 (Tex. 1976) ("It is a fundamental rule of law that only the person whose primary legal right has been breached may seek redress for an injury….Without breach of a legal right belonging to the plaintiff no cause of action can accrue to his benefit.  A suit to set aside a deed obtained by fraud can only be maintained by the defrauded party.  A party who was not defrauded by the conveyance has not suffered an invasion of a legal right and therefore does not have standing to bring suit based on that fraud.") (citations omitted).

[211] *Slaughter v. Qualls*, 162 S.W.2d 671, 674 (Tex. 1942).

### *(b) The BONY D/T Lien Assignment*

117.     Starting with BONY D/T Lien Assignment, the Plaintiffs allege that (a) BONY was never an assignee of the $23K Note D/T and, hence, Ocwen could never have made an assignment of the $23K Note Lien on behalf of BONY, (b) Ocwen did not have the authority to make an assignment on behalf of BONY, and (c) Ocwen did not execute the Recorded BONY D/T Lien Assignment Instrument.

118.     First, with respect to the alleged lack of an assignment into BONY, the Plaintiffs fail to take into account the fact that BONY became the holder of the $23K Note D/T and $23K Note Lien as a result of the following three transactions: *first*, the Sebring D/T Lien Assignment, whereby Sebring assigned the $23K Note Lien to Bank One pursuant to the Sebring D/T Lien Assignment Instrument; *second*, the Bank One Merger, whereby JPMorgan, as the successor by merger to Bank One, succeeded to Bank One's rights to the $23K Note D/T and $23K Note Lien; and *third*, the JPMorgan-BONY Transaction, whereby BONY acquired JPMorgan's interest in the $23K Note D/T and $23K Note Lien.  As a result of these three transactions, BONY became the holder of the $23K Note D/T and $23K Note Lien, contrary to the Plaintiffs' assertions otherwise.

119.     Next, with respect to the Plaintiffs' second and third arguments (relating to Ocwen's alleged lack of authority), the Plaintiffs predicate their assertions on the fact that Ocwen apparently (initially) claimed that it had no evidence within its own files of the $23K Loan or of any incoming or outgoing assignments of the $23K Note D/T.  Consequently, the Plaintiffs reasoned that the Recorded BONY D/T Lien Assignment Instrument must be a forgery.[212]  The problem with Plaintiffs' argument is that Ocwen did, in fact, subsequently discover records involving the $23K Loan, and the BONY Endorsement and BONY D/T Lien Assignment Instrument were produced.

---

[212] *See Vasquez v. Deutsche Bank Nat'l Trust Co., N.A*., 441 S.W.3d 783, 787 (Tex. App. – Houston [1st Dist.] 2014, no pet.) ("A forged deed is void").

120.    In this regard, at trial, Verdooren, an Ocwen employee, was called as a witness. Verdooren credibly explained that, upon further investigation, it was discovered that Ocwen had, in fact, served as a loan servicer for BONY during the period of time at issue and that the Ocwen records did, in fact, include the BONY Endorsement and BONY D/T Lien Assignment Instrument.

121.    This caused the Plaintiffs to pivot at trial.  The Plaintiffs added the following grounds to their attack: (a) the BONY D/T Lien Assignment Instrument produced by Ocwen must have been forged because Miller signed both the BONY D/T Lien Assignment Instrument *and* the RFC D/T Lien Assignment Instrument; and (b) alterations made to the BONY D/T Lien Assignment Instrument prior to PPR's recordation of it as the Recorded BONY D/T Lien Assignment Instrument constituted forgery, thereby causing both the BONY D/T Lien Assignment Instrument and the BONY D/T Lien Assignment to be void.

122.    With respect to the Plaintiffs' first challenge – Miller's alleged lack of authority to execute the BONY D/T Lien Assignment Instrument – the Defendants correctly assert that the Plaintiffs lack standing to pursue such challenge.  This is because where the genuineness of a signature on an instrument is not in question (*i.e.*, there is no alleged forgery), questions with respect to the *capacity* of the signatory to execute the instrument go to the voidability of the instrument, as opposed to the voidness of the instrument.  As explained by the Texas Supreme Court, "to be a forgery the signing must be by one who purports to act as another."[213]  "[O]ne who signs his true name, and does not represent himself to be someone else of the same name, does not commit a forgery because his act does not purport to be that of another."[214]  Similarly, "[t]he rule

---

[213] *Nobles*, 533 S.W.2d at 926; *see also* Tex. Penal Code § 32.21(a)(1)(A) (cited by both parties; defining "forge" to include the altering, making, completing, or executing of a writing so that it purports to be the act of another who did not authorize the act).

[214] *Nobles*, 533 S.W.2d at 926.

is also clear that one who signs his true name, purporting to act as the agent of another, has not committed a forgery."[215]

123.   Here, the Plaintiffs did not put on any evidence of someone *other than Miller* having signed the BONY D/T Lien Assignment Instrument as Miller.   Indeed, Miller's signature on the BONY D/T Lien Assignment Instrument was contemporaneously notarized.   And "[t]he law is settled that a certificate of acknowledgement is prima facie evidence that [the signatory] appeared before the notary and executed the [instrument] in question for the purposes and consideration therein expressed."[216]   Thus, the Plaintiffs have failed to establish that the BONY D/T Lien Assignment Instrument was forged.   Whether Miller lacked authority to sign the instrument, on the other hand, is a voidability matter (between BONY and RFC) as to which the Plaintiffs lack standing.[217]

124.   Turning to alterations made to the BONY D/T Lien Assignment Instrument before it was recorded as the Recorded BONY D/T Lien Assignment Instrument, while the alterations were nonmaterial in nature – simply correcting the county of recordation of the original $23K Note D/T (from Dallas County to Tarrant County) and adding reference to an attached legal description of the Property that mirrored the legal description of the Property set forth within the original $23K Note D/T – they are nevertheless problematic because they had the effect of altering the BONY D/T Lien Assignment Instrument actually signed by Miller *after* she had signed it.   In other words, it is very possible that the Recorded BONY D/T Lien Assignment Instrument does, technically,

---

[215] *Id.*

[216] *Bell v. Sharif-Munir-Davidson Dev. Corp.*, 738 S.W.2d 326, 330 (Tex. App. – Dallas 1987, writ denied); *see also Uribe v. Carrington Mortgage Servs., LLC*, No. 04-19-00077-CV, 2020 WL 2543304, at *4 (Tex. App. – San Antonio May 20, 2020, no pet.).

[217] Moreover, Verdooren explained that when the servicing of a portfolio changed upon a sale of the portfolio, Ocwen would authorize the new servicer to execute documents on behalf of Ocwen to effectuate the assignments provided for in the sale.

constitute a "forgery" under the law. The proper course of action would have been for PPR to simply record the original BONY D/T Lien Assignment Instrument and then follow it up with the filing of a correction instrument, as permitted by the Texas Property Code.[218]

125.   That said, while legitimate questions exist with respect to the validity of the Recorded BONY D/T Lien Assignment Instrument, no such questions exist with respect to the original BONY D/T Lien Assignment Instrument.   Importantly, Texas' recording statute is designed to protect a subsequent purchaser of real property for value without notice, as well as creditors of a mortgagor.[219]   It is not designed to provide some form of special protection to the grantor of a conveyance or assignment in the event of a defect in recordation.   As recognized within the Texas Property Code, itself, "[t]he unrecorded instrument is binding on a party to the instrument, on the party's heirs, and on a subsequent purchaser who does not pay a valuable consideration or who has notice of the instrument."[220]   Thus, even if the validity of the Recorded BONY D/T Lien Assignment Instrument is in question on account of the nonmaterial modifications made prior to filing, it does not change the fact that the BONY D/T Lien Assignment was effectuated pursuant to the original BONY D/T Lien Assignment Instrument.

126.   For the foregoing reasons, the BONY D/T Lien Assignment is hereby determined to be valid.

### (c) The RFC D/T Lien Assignment

127.   Turning to the RFC D/T Lien Assignment, the Plaintiffs similarly argue the following points in support of their assertion that the assignment is invalid: (a) the RFC D/T Lien

---

[218] *See* Tex. Prop. Code §§ 5.027(a), 5.028, and 5.030(a)-(b).

[219] *See* Tex. Prop. Code § 13001(a) (providing that a conveyance of a deed of trust is void "as to a creditor or to a subsequent purchaser for a valuable consideration without notice unless the instrument has been acknowledged, sworn to, or proved and filed for record as required by law"); *see also Reinagel*, 735 F.3d at 227.

[220] Tex. Prop. Code § 13.001(b).

Assignment Instrument must have been forged because Miller signed both the BONY D/T Lien Assignment Instrument *and* the RFC D/T Lien Assignment Instrument, and (b) alterations made to the RFC D/T Lien Assignment Instrument prior to PPR's recordation of it as the Recorded RFC D/T Lien Assignment Instrument constituted forgery, thereby causing both the RFC D/T Lien Assignment Instrument and the RFC D/T Lien Assignment to be void.

128.    First, with respect to Miller's authority to execute the RFC D/T Lien Assignment Instrument, the Defendants again correctly assert that the Plaintiffs lack standing to question Miller's authority.  The Plaintiffs did not put on any evidence of someone *other than Miller* having signed the RFC D/T Lien Assignment Instrument as Miller.  And Miller's signature on the RFC D/T Lien Assignment Instrument was contemporaneously notarized.  Thus, the Plaintiffs have failed to establish that the RFC D/T Lien Assignment Instrument was forged.  Whether Miller lacked authority to sign the instrument, on the other hand, is a voidability matter (between RFC and Stelis) as to which the Plaintiffs lack standing.[221]

129.    Second, with respect to alterations made to the RFC D/T Lien Assignment Instrument before it was recorded as the Recorded RFC D/T Lien Assignment Instrument, the alterations were identical to the nonmaterial alterations made to the BONY D/T Lien Assignment Instrument.  Hence, while a question may well exist with respect to the validity of the Recorded RFC D/T Lien Assignment Instrument, no such question exists with respect to the original RFC D/T Lien Assignment Instrument.  Thus, even if the validity of the Recorded RFC D/T Lien Assignment Instrument is in question on account of the nonmaterial modifications made prior to

---

[221] Moreover, Verdooren explained that when the servicing of a portfolio changed upon a sale of the portfolio, Ocwen would authorize the new servicer to execute documents on behalf of Ocwen to effectuate the assignments provided for in the sale.

filing, it does not change the fact that the RFC D/T Lien Assignment was effectuated pursuant to the original RFC D/T Lien Assignment Instrument.

130.   For the foregoing reasons, the RFC D/T Lien Assignment is also hereby determined to be valid.

### (d) The Stelis D/T Lien Assignment

131.   Turning to the Stelis D/T Lien Assignment, the Plaintiffs argue the following points in support of their assertion that the assignment is invalid: (a) Fullum's execution of the Stelis D/T Lien Assignment Instrument on behalf of Stelis was a forgery because Fullum allegedly lacked the authority to execute it on behalf of Stelis; and (b) alterations made to the Stelis D/T Lien Assignment Instrument prior to PPR's recordation of it as the Recorded Stelis D/T Lien Assignment Instrument constituted forgery, thereby causing both the Stelis D/T Lien Assignment Instrument and the Stelis D/T Lien Assignment to be void.  These arguments are substantially similar to the arguments addressed above in relation to the BONY D/T Lien Assignment and RFC D/T Lien Assignment.

132.   First, with respect to Fullum's authority to execute the Stelis D/T Lien Assignment Instrument, the Defendants again correctly assert that the Plaintiffs lack standing to question Fullum's authority.  The Plaintiffs did not put on any evidence of someone *other than Fullum* having signed the Stelis D/T Lien Assignment Instrument as Fullum.  And Fullum's signature on the Stelis D/T Lien Assignment Instrument was contemporaneously notarized.  Thus, Plaintiffs' forgery assertion in relations to the Stelis D/T Lien Assignment Instrument lacks merit.

133.   In regard to Fullum's authority to sign, Fullum executed the Stelis D/T Lien Assignment Instrument as the (ostensibly) authorized agent of Stelis predicated upon the Fullum Resolution signed by Palmer; and Palmer was (ostensibly) authorized to sign the Fullum Resolution based upon the Palmer Authorization granted by Stelis and as an agent of DBI VIII,

who Stelis had appointed to serve as its Mortgage Servicer.  At the time of Palmer's execution of

the Fullum Resolution, the Palmer Authorization was in force (having not been revoked until May

11, 2015) and DBI VIII was Stelis' Mortgage Servicer (such appointment having not been

terminated until February 24, 2015).  With the foregoing in mind, the Plaintiffs did not put on any

evidence of someone *other than Palmer* having signed the Fullum Resolution as Palmer.  Whether

or not Palmer actually had the organizational and/or contractual authority to grant the signatory

authority to Fullum provided within the Fullum Resolution is an issue of voidability (between

Stelis and PPR) as to which the Plaintiffs lack standing.

134.    Second, with respect to alterations made to the Stelis D/T Lien Assignment

Instrument before it was recorded as the Recorded Stelis D/T Lien Assignment Instrument, it is

necessary to distinguish between the insertion of PPR's name and address as the assignee and the

correction of the book/reel/liber and page/folio numbers.  In the case of the insertion of PPR's

name and address, the insertion was permissible and did not constitute an alteration for forgery

consideration purposes.  As recognized by the Texas Supreme Court (albeit in the context of

negotiable instruments), "[t]he general rule seems to be that where a writing containing unfilled

blanks has been delivered there is implied authority to fill in the blanks, the instrument remaining

valid."[222]

135.    In the case of the corrected book/reel/liber and page/folio numbers, on the other

hand, while the alterations were nonmaterial in nature, they present the same types of concerns as

described in relation to the Recorded BONY D/T Lien Assignment Instrument and Recorded RFC

D/T Lien Assignment Instrument because it has the effect of altering the instrument actually

---

[222] *Republic Nat'l Bank of Dallas v. Strealy*, 350 S.W.2d 914, 917-18 (Tex. 1961); *see also Close v. Fields*, 2 Tex. 232, 234 (Tex. 1847) ("if a bill or note be issued with a blank for the payee's name, any *bona fide* holder may insert his own name as payee").

executed by Fullum on behalf of Stelis.  Even so, while a question may exist with respect to the validity of the Recorded Stelis D/T Lien Assignment Instrument, no such question exists with respect to the original Stelis D/T Lien Assignment Instrument delivered to PPR.  Thus, even if the validity of the Recorded Stelis D/T Lien Assignment Instrument is in question on account of the nonmaterial modifications made prior to filing, it does not change the fact that the Stelis D/T Lien Assignment was effectuated pursuant to the original Stelis D/T Lien Assignment Instrument.

136.   For the foregoing reasons, the Stelis D/T Lien Assignment is also hereby determined to be valid.

### 3.   *Validity of the Foreclosure Sale Deed*

137.   Finally, the Plaintiffs argue that the Foreclosure Sale Deed is invalid because PPR was never a valid holder of the $23K Note Lien and, thus, never had the authority to appoint the Substitute Trustee or to direct the Substitute Trustee to conduct the foreclosure.  Additionally, the Plaintiffs assert that they owed nothing under the $23K Note; therefore, there was no basis for PPR to conduct the foreclosure.

### (a) *PPR's Holding of the $23K Note Lien*

138.   For their first argument, the Plaintiffs rely upon the invalidity of one or more of the deed of trust lien assignments.  For reasons explained above, however, each of the Plaintiffs' arguments with respect to the invalidity of the deed of trust lien assignments lacks merit. Therefore, the Plaintiffs' corresponding Foreclosure Sale Deed argument likewise fails.

139.   Moreover, even if one or more of the deed of trust assignments had been determined to be invalid, PPR would still have had the right to direct the Substitute Trustee to conduct the foreclosure because PPR was the holder of the original-executed $23K Note and Texas law

recognizes that the mortgage follows the note.[223]   As explained by one Texas appellate court, "[e]ven if a party does not have a recorded interest in a security instrument, the party may still have standing to foreclose if the party is the holder or owner of a note secured by the instrument. This rule derives from the common law maxim, now codified in Texas, that 'the mortgage follows the note.'"[224]

### (b) Release of the Underlying $23K Note Debt

140.   Next, with respect to the Plaintiffs' argument that nothing was owed under the $23K Note, the Defendants assert that the Plaintiffs have failed to substantiate any release of such liability.  The Court agrees.

141.   While, in connection with the Plaintiffs' First Bankruptcy Case, it does appear as though the $23K Loan may have been *internally* "charged off" during the time in which JPMorgan owned the $23K Note, the "charge off" of a loan does not equate to a release of liability.  The charge-off of a loan simply "means the bank changed the debt from a receivable to a loss on its own accounting books."[225]   "The fact that such a debt has been charged off thus does not mean that it is uncollectible as a matter of law."[226]   "A 'charge-off' classification means a lender or

---

[223] *See* Tex. Bus. & Com. Code § 9.203(g) ("The attachment of a security interest in a right to payment … secured by a … lien on … real property is also attachment of a security interest in the … mortgage"); *see also id.* cmt. 9 ("Subsection (g) codifies the common-law rule that a transfer of an obligation secured by a … lien on … real property also transfers the … lien").

[224] *EverBank, N.A. v. Seedergy Ventures, Inc.*, 499 S.W.3d 534, 538 (Tex. App. – Houston [14th Dist.] 2016, no pet.) (citing Tex. Bus. & Com. Code § 9.203(g)); *see also SGK Props., LLC v. U.S. Bank Nat'l Ass'n,* 881 F.3d 933, 942 (5th Cir.) (under Texas law, even if a deed of trust assignment is determined to have been forged and thus void, the holder of the promissory note may still foreclose because the mortgage follows the note), *cert. denied*, 586 U.S. 876 (2018); *Antony v. United Midwest Sav. Bank*, Civil Action No. H-15-1062, 2016 WL 914975, at *3 (S.D. Tex. Mar. 10, 2016), *aff'd*, 673 Fed. Appx. 447 (5th Cir. 2017).

[225] *Anderson v. Credit One Bank, N.A. (In re Anderson)*, 884 F.3d 382, 385 (2nd Cir.), *cert. denied*, 586 U.S. 823 (2018).

[226] *Anderson v. Credit One Bank, N.A. (In re Anderson)*, 641 B.R. 1, 14 (Bankr. S.D.N.Y 2022).

creditor has written the account off as a loss, but the debt can still be sold to a debt buyer or collection agency, and the debtor is still legally obligated to pay the debt."[227]

142.     With that in mind, the Plaintiffs have failed to substantiate any agreement to the release of liability on the $23K Loan.  Nowhere within either the Loan Mod Approval Letter or the Loan Mod Agreement is there a release of the $23K Note or the Plaintiffs' liability thereunder.  In fact, no mention is even made of the $23K Loan or $23K Note.  Consequently, the Plaintiffs remained obligated on the $23K Loan at the time of each of the subsequent note and deed of trust lien assignments and as of the time of the foreclosure leading to issuance of the Foreclosure Sale Deed.

143.     As a result, the Foreclosure Sale Deed is also hereby determined to be valid.

**B.     *Wrongful Foreclosure (Counts 2 and 3)***

144.     Pursuant to Counts 2 and 3 of the Amended Complaint, the Plaintiffs have asserted claims for wrongful foreclosure – Count 2 against both of the Defendants; Count 3 against PPR alone.  In Texas, "[t]he elements of a wrongful foreclosure claim are: (1) a defect in the foreclosure sale proceedings; (2) a grossly inadequate selling price; and (3) a causal connection between the defect and the grossly inadequate selling price."[228]

145.     With respect to the first element, the Plaintiffs assert two different types of defects in Counts 2 and 3 of the Amended Complaint.  Each is considered in turn.

**1.     *Alleged Defect of Forged Instruments (Count 2)***

146.     First, pursuant to Count 2, the Plaintiffs again allege that the deed of trust lien assignments through which PPR claimed to have acquired the $23K Note Lien were tainted by

---

[227] *Annor v. PHH Mortgage Servs., LLC*, Civil Action No. 4:22-CV-02202, 2023 WL 7926810, at *1 (S.D. Tex. Nov. 16, 2023).

[228] *Sauceda v. GMAC Mortgage Corp.*, 268 S.W.3d 135, 139 (Tex. App. – Corpus Christi 2008, no pet.); *see also Hurd v. BAC Home Loans Servicing, LP*, 880 F. Supp.2d 747, 766 (N.D. Tex. 2012).

forgeries, thereby also tainting the foreclosure.  For all of the reasons previously discussed, the Plaintiffs have failed to establish that any of the $23K Note Lien assignments leading up to and including the assignment to PPR was invalid on account of forgery.  Plus, as the holder of the $23K Note, PPR had an additional basis upon which to exercise the right of foreclosure, as explained above.

147.    Therefore, the Plaintiffs have failed to satisfy the first element of wrongful foreclosure under Count 2.  As a result, it is unnecessary to consider the other elements of wrongful foreclosure in relation to Count 2 and judgment will be entered against the Plaintiffs on such count.

### 2.    *Alleged Defect of Foreclosing in Violation of TRO (Count 3)*

148.    Next, pursuant to Count 3, the Plaintiffs allege that PPR caused the foreclosure to be conducted in violation of the Third TRO.  With respect to this basis, the Plaintiffs' claim fails for two reasons.

149.    First, this issue was already considered and rejected by the Texas state court that presided over the Second Eviction Case in entering the Second Eviction Judgment.  The Second Eviction Judgment was never appealed.  Thus, as previously addressed in connection with the Plaintiffs' appeal of the Final Lift Stay Order, "the *Rooker-Feldman* doctrine precludes [a federal court] from reconsidering the validity of [Arbelaez Investment's] title when the parties have already litigated and the County Court adjudicated the validity…."[229]

150.    Second, even if consideration of the Plaintiffs' claim were not precluded, by its terms the Third TRO expired prior to the commencement of the foreclosure sale.  While there was an attempt to extend the Third TRO prior to its expiration, the effort was a failure because the

---

[229] Bankruptcy Case Docket No. 106, at pp.4-5 (District Court Order (O'Connor, C.J.) affirming Final Lift Stay Order); *see also Truong v. Bank of Am., N.A.*, 717 F.3d 377, 382 (5th Cir. 2013) ("'[T]he *Rooker-Feldman* doctrine holds that inferior federal courts do not have the power to modify or reverse state court judgments' except when authorized by Congress").

Hearing Continuance Order submitted on behalf of the Plaintiffs and entered by the state court did not extend the term of the Third TRO and did not include any of its own injunctive language. Indeed, in their pretrial brief, the Plaintiffs acknowledge these problems.[230]

151.    Therefore, the Plaintiffs have also failed to satisfy the first element of wrongful foreclosure under Count 3.  As a result, it is unnecessary to consider the other elements of wrongful foreclosure in relation to Count 3 and judgment will be entered against the Plaintiffs on such count.

### 3.    *Arbelaez Investments' Good Faith Purchaser for Value Affirmative Defense*

152.    Even if the Plaintiffs had established an actionable defect for purposes of Count 2, Arbelaez Investments has asserted the affirmative defense of being a good faith purchaser for value.  "Status as a bona fide purchaser is an affirmative defense to a title dispute….To receive this special protection, one must acquire property in good faith, for value, and without notice of any third-party claim or interest."[231]

153.    Here, Arbelaez Investments satisfied the elements of such protection.  As explained by Arbelaez, Arbelaez Investments learned of the foreclosure sale as a result of its normal course activity of looking for foreclosure sale purchasing opportunities; it had no prior knowledge of the ongoing litigation between the Plaintiffs and PPR or of any alleged defects with respect to the deed of trust lien assignments; it engaged in the foreclosure sale process in good faith, competitively bidding among several other bidders; and it paid good and legally sufficient value for the Property ($49,000, noting that the Property was taken subject to the first priority lien associated with the $132K Loan).

---

[230] *See* Adv. Docket No. 294, at p.10 (referring to the Plaintiffs' lack of knowledge of the "technical defect" that "rendered the … TRO unenforceable").

[231] *Madison v. Gordon*, 39 S.W.3d 604, 606 (Tex. 2001) (citations omitted).

154.     Consequently, the Plaintiffs' wrongful foreclosure claim against Arbelaez Investments under Count 2 is also barred on the basis of the good faith purchaser for value without knowledge affirmative defense.

## C.     Intentional Infliction of Emotional Distress (Count 6)

155.     Pursuant to Count 6 of the Amended Complaint, the Plaintiffs have asserted a claim against PPR for intentional infliction of emotional distress ("**IIED**").  Specifically, the Plaintiffs assert that PPR knowingly, intentionally, and unlawfully caused the Property to be foreclosed, which foreseeably thereafter caused the Plaintiffs to suffer physical, mental, and emotional harm.

156.     Under Texas law, to recover for IIED, a plaintiff must show: (1) that the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe.[232]  Here, PPR asserts that the Plaintiffs have failed to both establish that any of the actions taken by PPR were "extreme and outrageous", and that any of PPR's actions caused the Plaintiffs emotional distress.  The Court agrees.

### 1.     Extreme and Outrageous Conduct

157.     The claim of IIED is a "gap-filler" tort that was "judicially created for the limited purpose of allowing recovery in those rare instances in which a defendant intentionally inflicts severe emotional distress in a manner so unusual that the victim has no other recognized theory of redress."[233]  "A defendant's conduct satisfies the second element only if it is '"so outrageous in

---

[232] *See Hoffmann-LaRoche, Inc. v. Zeltwanger*, 144 S.W.3d 438, 445 (Tex. 2004).

[233] *Id.* at 447 (citing *Standard Fruit & Vegetable Co. v. Johnson*, 985 S.W.2d 62, 68 (Tex. 1998)).

character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.""[234]

158.    Here, PPR's actions in pursuing foreclosure of the Property, even in the face of questions as to the validity of certain of the recorded lien assignment instruments, comes nowhere remotely close to the level of "extreme and outrageous" conduct required to present a viable IIED claim.  "The actions of a financial institution attempting to enforce its contractual right to foreclose on a deed of trust under which the homeowner has defaulted, without more, do not meet the high bar of 'outrageous' behavior."[235]

### 2.    *Causation of Emotional Distress*

159.    Turning to the third element of an IIED claim, it is not enough for a plaintiff to have suffered emotional distress as an outcome of conduct undertaken by the plaintiff.  Instead, a recovery under an IIED claim "is available only in those situations in which severe emotional distress is the intended consequence or primary risk of the actor's conduct."[236]

160.    With the foregoing in mind, while it certainly appears that the Plaintiffs suffered considerable emotional distress on account of the reprehensible actions taken by the Constable's Office during the eviction process (*i.e.*, the disrespectful handling of the Plaintiffs' son's cremation ashes, the disappearance of the Plaintiffs' son's semi-pro football championship rings, and the damage to furniture), no evidence was presented of PPR having foreclosed on the Property with the intent for any of those actions to have been taken or, frankly, for any emotional distress at all

---

[234] *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 796 (Tex. 2006) (quoting *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex. 1993) (quoting Restatement (Second) of Torts § 46 cmt. D (1965))).

[235] *Lakiesha v. Bank of New York Mellon*, Civil Action No. 3:15-CV-0901-B, 2015 WL 5934439, at *7 (N.D. Tex. Oct. 9, 2015) (quoting *Auriti v. Wells Fargo Bank, N.A.*, No. 12-CV-0334, 2013 WL 2417832, at *8 (S.D. Tex. June 3, 2013)); *see also Strange v. Flagstar Bank, FSB*, Civil Action No. 3:11-CV-2642-B, 2012 WL 987584, at *5 (N.D. Tex. Mar. 22, 2012) (allegations centering on foreclosure and contract issues found to be "far from the type of allegations of outrageous and intolerable conduct required to sustain a claim for intentional infliction of emotional distress").

[236] *Johnson*, 985 S.W.2d at 67.

to ever be caused to the Plaintiffs.  Additionally, no evidence was introduced remotely suggesting that PPR had any knowledge of what post-foreclosure eviction steps Arbelaez Investments would later be taking or, more importantly, what actions the Constable's Office would be taking in evicting the Plaintiffs from the Property.

161.    As a result of the Plaintiffs' failure to satisfy at least two of the necessary elements for an IIED claim – (a) extreme and outrageous conduct, and (b) causation of emotional distress – the IIED claim will be denied.

### D.    Damages and Attorney's Fees

162.    Pursuant to Counts 4 and 5 of the Amended Complaint, the Plaintiffs have requested compensatory and exemplary damages against the Defendants.

163.    To recover compensatory damages, a plaintiff must necessarily succeed on an underlying claim for which the recovery of compensatory damages is recognized.  Here, the Plaintiffs have succeeded on none of their underlying claims for relief.  Therefore, compensatory damages will not be awarded.

164.    In the case of exemplary damages, the Texas Civil Practice and Remedies Code allows for their recovery in the event of fraud, malice, or gross negligence.[237]  However, "exemplary damages may be awarded only if damages other than nominal damages are awarded."[238]  Thus, here, because no compensatory damages have been awarded to the Plaintiffs on any of their underlying claims, there no basis upon which to award any exemplary damages.

---

[237] *See* Tex. Civ. Prac & Rem. Code § 41.003(a).

[238] *Id*. § 41.004(a).

165.    Finally, with respect to attorney's fees, "[i]n Texas, as in the federal courts, each party generally must pay its own way in attorney's fees."[239]  As explained by the Supreme Court, "'Our basic point of reference' when considering the award of attorney's fees is the bedrock principle known as the 'American Rule': Each litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise."[240]

166.    Here, in relation to all Counts other than Count 1, the Plaintiffs have failed to identify any statute or contract under which a non-prevailing party is entitled to the recovery of attorney's fees.

167.    In the case of Count 1 (the FDJA claim to remove the cloud on title / quiet title), where the declaratory relief sought is tied to substantive state law, the FDJA authorizes an award of attorney's fees where the controlling substantive state law permits such recovery.[241]  Under controlling Texas law, "[a]ttorney's fees are not available in a suit to quiet title or to remove cloud on title."[242]  Therefore, no attorney's fees will be awarded to the Plaintiffs or PPR.

## *CONCLUSION*

168.    Based upon all of the foregoing, the Bankruptcy Court respectfully recommends to the District Court that a final judgment be issued providing for the following relief:

(a)    In relation to Count 1 of the Amended Complaint: (i) a declaration that each of the BONY D/T Lien Assignment, the RFC D/T Lien Assignment, and the Stelis D/T Lien Assignment is valid and enforceable and was valid and enforceable as of the date and time of the foreclosure sale of the Property on June 5, 2018; and (ii) a declaration that the Foreclosure Sale Deed is valid and enforceable;

---

[239] *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 483 (Tex. 2019) (citing, *inter alia*, *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 550 (2010)).

[240] *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 253-53 (2010).

[241] *See AG Acceptance Corp. v. Veigel*, 564 F.3d 695, 701 (5th Cir. 2009).

[242] *AMC Mortgage Servs., Inc. v. Watts*, 260 S.W.3d 582, 588 (Tex. App. – Dallas 2008, no pet.) (quoting *Sani v. Powell*, 153 S.W.3d 736, 745 (Tex. App. – Dallas 2005, pet. denied) (quoting *Southwest Guar. Trust Co. v. Hardy Road 13.4 Joint Venture*, 981 S.W.2d 951, 956-57 (Tex. App. – Houston [1st Dist.] 1998, pet denied))).

(b)     In relation to Counts 2, 3, 4, 5 and 6 of the Amended Complaint, that the Plaintiffs take nothing from the Defendants;

(c)     In relation to requests for the recovery of attorney's fees, that all such requests be denied;

(d)     In relation to costs, that the Defendants recover their respective costs of court from Plaintiffs pursuant to Fed. R. Bankr. P. 7054(d)(1); and

(e)     In relation to all other relief (if any) sought in the Adversary Proceeding by any party, that such relief be denied.

    # # #   END OF PROPOSED FINDINGS AND CONCLUSIONS   # # #